RECORD NO. 14-1924

IN THE

# United States Court of Appeals

## FOR THE FOURTH CIRCUIT

CATLIN SPECIALTY INSURANCE COMPANY,

*Plaintiff-Appellant,*

v.

BARRY I. ARON, M.D. ; BARRY I. ARON, M.D., P.C.
SHERRY MARIE PFENNINGER;
JERRY PFENNINGER,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND AT BALTIMORE

## OPENING BRIEF OF APPELLANT
## CATLIN SPECIALITY INSURANCE COMPANY

Gregory W. Brown
Matthew R. Gambale
BROWN LAW, LLP
4130 Parklake Avenue, Suite 130
Raleigh, North Carolina 27612
(919) 719-0854
gregory@brownlawllp.com
gambale@brownlawllp.com

Thomas P. Bernier
SEGAL MCCAMBRIDGE SINGER
& MAHONEY
1 North Charles Street, Suite 2500
Baltimore, Maryland 21201
(410) 779-3960
tbernier@smsm.com

*Counsel for Appellant*

LANTAGNE LEGAL PRINTING 801 East Main Street Suite 100 Richmond, Virginia 23219 (804) 644-0477
A Division of Lantagne Duplicating Services

## CORPORATE DISCLOSURE STATEMENT

In accordance with FED. R. APP. P. 26.1, Appellant states as follows: Appellant is not a publicly held corporation. No publicly held corporation or other publicly held entity has a direct financial interest in the outcome of this litigation. Appellant is not a trade association. This case does not arise out of a bankruptcy proceeding.

**TABLE OF CONTENTS**

Page

CORPORATE DISCLOSURE STATEMENT.................................................i

TABLE OF AUTHORITIES ..........................................................iv

I. STATEMENT OF JURISDICTION ...............................................1

II. STATEMENT OF THE ISSUES .................................................1

III. STATEMENT OF THE CASE ..................................................2

  A. THE UNDERLYING SURGERY ..........................................3

    1. Dr. Aron Perforated The Small Bowel And Severed The Ureter ..................................................................3
    2. Dr. Aron Received Notice That The Ureter Was Severed .......4
    3. Dr. Aron Knew That The Ureter Required Reconstruction.....4
    4. Dr. Aron Knew That The Ureter Being Severed Was Significant For Insurance And Peer Review Purposes...............5

  B. DR. ARON OBTAINED MEDICAL MALPRACTICE INSURANCE FROM CATLIN ................................................6

  C. DR. ARON RECEIVED REPEATED CORRESPONDENCE FROM MS. PFENNINGER'S LAWYERS REGARDING THE INCIDENT ..................................................................9

  D. DR. ARON DELAYED REPORTING THE PFENNINGER INCIDENT TO CATLIN.................................................10

    1. The 2011 Renewal Application ...................................10
    2. The 2012 Renewal Application ...................................11

  E. CATLIN DENIED COVERAGE .......................................12

IV. SUMMARY OF ARGUMENT ......................................................12

V. ARGUMENT ....................................................................14

A.    STANDARD OF REVIEW ...................................................................14

B.    BECAUSE THE PFENNINGER MATTER DID NOT RESULT IN A CLAIM THAT WAS FIRST-MADE AGAINST THE INSUREDS AND REPORTED TO CATLIN DURING THE POLICY PERIOD OF THE 2012 POLICY, THE DISTRICT COURT ERRED IN HOLDING THAT THE 2012 POLICY AFFORDS ANY COVERAGE FOR THE PFENNINGER MATTER ...................................................................15

    1.    The Pfenninger Matter Is Not Covered By The 2012 Policy's Insuring Clause ................................................15
    2.    Md. Code Ins. § 19–110 Does Not Apply To Require That Catlin Show Prejudice ................................................17

C.    BECAUSE THE 2012 POLICY EXCLUDES INCIDENTS THAT WERE BROUGHT TO THE ATTENTION OF THE INSUREDS BEFORE THE 2012 POLICY'S INCEPTION DATE, THE DISTRICT COURT ERRED IN HOLDING THAT THE 2012 POLICY AFFORDS ANY COVERAGE FOR THE PFENNINGER MATTER ................................................21

    1.    The Pfenninger Matter Is Based On An Incident ....................22
    2.    The Incident Was Brought To Dr. Aron's Attention Before The 2012 Policy Incepted ................................................23

VI.    CONCLUSION ...................................................................................26

REQUEST FOR ORAL ARGUMENT ................................................................27

CERTIFICATE OF COMPLIANCE ..................................................................28

CERTIFICATE OF SERVICE ..........................................................................29

ADDENDUM .....................................................................................................30

iii

# TABLE OF AUTHORITIES

## CASES

Page

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)...................................................................................15

*Bryan Brothers Inc. v. Cont'l Casualty Co.*,
660 F.3d 827 (4th Cir. 2011) .....................................................................25

*Culver v. Cont'l Ins. Co.*,
11 F. App'x 42 (4th Cir. 1999) ..................................................................25

*Fin. Indus. Regulatory Auth., Inc. v. Axis Insurance Co.*,
951 F. Supp. 2d 826 (D. Md. 2013).............................................................19

*Janjer Enters., Inc. v. Executive Risk Indem., Inc.*,
97 F. App'x 410, 414 (4th Cir. 2004)..........................................................18

*Maynard v. Westport Insurance Corp.*,
208 F. Supp. 2d 568 (D. Md. 2002)..............................................................18

*McDowell Building, LLC v. Zurich America Insurance Co.*,
2013 WL 5234250 (D. Md. 2013)................................................................19

*Minnesota Lawyers Mutual Insurance Co. v. Baylor & Jackson, PLLC*,
852 F. Supp. 2d 647 (D. Md. 2012)........................................................ 19, 20

*Nat'l Cas. Co. v. Lockheed Martin Corp.*,
799 F. Supp. 2d 537 (D. Md. 2011)..............................................................20

*Navigators Specialty Insurance Co. v. Medical Benefits Adm'rs of MD, Inc.*,
2014 WL 768822 (D. Md. 2014)..................................................................19

*Pac. Indemnity Co. v. Interstate Fire & Casualty Co.*,
302 Md. 383, 488 A.2d 486 (Md. Ct. App. 1985).......................................22

*Pfenninger, et al. v. Aron, et al.*,
No. 8:13-CV-00844-RDB (D. Md. 2013)....................................................2

iv

*Prop. & Casualty Insurance Guaranty Corp. v. Beebe-Lee,*
    431 Md. 474, 66 A.3d 615 (Md. Ct. App. 2013) ......................................................15

*Rossignol v. Voorhaar,*
    316 F.3d 516 (4th Cir. 2003) *cert. den'd*, 540 U.S. 822 (2003) ...................................14

*Seabulk Offshore, Ltd. v. American Home Assur. Co.,*
    377 F.3d 408 (4th Cir. 2004) ......................................................................................14

*Sherwood Brands, Inc. v. Great America Insurance Co.,*
    418 Md. 300, 13 A.3d 1268 (Md. Ct. App. 2011).......................................17, 19, 20

*Sullins v. Allstate Insurance Co.,*
    340 Md. 503 (Md. Ct. App. 1995) ..............................................................................23

*T.H.E. Ins. Co. v. P.T.P., Inc.,*
    331 Md. 406, 628 A.2d 223 (Md. Ct. App. 1993)................................................. 17, 18

## STATUTES AND CODES

28 U.S.C. § 1291 ...........................................................................................................1
28 U.S.C. § 1332(a) .......................................................................................................1

Md. Code Ins. § 19-110 ................................................ 12, 13, 15, 17, 18, 19, 20, 21, 27

## RULES

Fed. R. App. P. 26.1 ..........................................................................................................i
Fed. R. App. P. 32.1 .......................................................................................................19
Fed. R. Civ. P. 56(c)(2) .................................................................................................14

# I.  STATEMENT OF JURISDICTION

The United States District Court for the District of Maryland had jurisdiction over this matter under 28 U.S.C. § 1332(a) because the parties are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs. This Court has jurisdiction under 28 U.S.C. § 1291 because this is an appeal from a final Order and Judgment of a United States District Court in this Circuit. Further, because the final Order and Judgment of the District Court was entered on August 6, 2014, and because Appellant filed its Notice of Appeal on September 3, 2014, the appeal is timely and ripe for adjudication.

# II.  STATEMENT OF THE ISSUES

1.    Whether the United States District Court for the District of Maryland erred in holding that an insurance policy issued by Appellant affords coverage for a medical malpractice matter although the policy is a claims-made-and-reported policy, and the medical malpractice matter did not result in a claim that was first-made against the insureds and reported to Appellant during the policy period.

2.    Whether the United States District Court for the District of Maryland erred in holding that an insurance policy issued by Appellant affords coverage for a medical malpractice matter despite an exclusion for incidents that were brought to the attention of the insureds before the policy's inception date.

### III. STATEMENT OF THE CASE

This is a declaratory judgment action in which Catlin Specialty Insurance Company ("Catlin") seeks a declaration that it is not obliged to provide coverage to its insureds Dr. Barry I. Aron, M.D. ("Dr. Aron") and his professional corporation Barry I. Aron, M.D., P.C., for alleged medical malpractice in the case of *Pfenninger, et al. v. Aron, et al.*, Civ. A. No. RDB–13–844, in the United States District Court for the District of Maryland (together with its underlying circumstances, the "*Pfenninger* Matter").[1] Catlin denied coverage for the *Pfenninger* Matter and instituted this lawsuit in the United States District Court for the District of Maryland because the Catlin policies in issue are claims-made-and-reported policies, and the *Pfenninger* Matter did not result in a claim being both first-made against the insureds and reported to Catlin in the same policy period. Moreover, the underlying incident had been brought to the attention of the insureds before Catlin's policies incepted, and therefore the *Pfenninger* Matter is excluded from coverage by the policies' exclusions. Catlin and the Aron Appellees filed cross motions for summary judgment, and the District Court denied Catlin's Motion and granted the Aron Appellees' Motion. Catlin timely noted this appeal of the District Court's Order.

---

[1]    In addition to the Aron Appellees, Catlin also named Sherry Marie Pfenninger and Jerry Pfenninger as Defendants in its declaratory judgment action because they are the Plaintiffs in the underlying medical malpractice action and, therefore, they are interested parties in this action.

A.     THE UNDERLYING SURGERY.

On December 30, 2010, Dr. Aron performed a surgical procedure known as a pelvic laparotomy on his patient Sherry Marie Pfenninger at the hospital that was then called the Civista Medical Center in La Plata, Maryland. (JA 320–25.) The purpose of the operation was to treat recurrent pain in Ms. Pfenninger's pelvic area related to "ovarian remnants" and internal scar tissue, known as "adhesions," that previous surgeries had left behind. (JA 318–19.) At the time, Dr. Aron was performing one or two surgeries of this type each month. (JA 259.) Unfortunately, two complications arose during Dr. Aron's surgery on Ms. Pfenninger that required consultation with four other specialists, and that ultimately required Ms. Pfenninger to return to the hospital for corrective procedures.

1.     <u>**Dr. Aron Perforated The Small Bowel And Severed The Ureter.**</u>

While entering Ms. Pfenninger's abdomen to begin the surgery, Dr. Aron inadvertently perforated the small bowel, which called for immediate, unplanned correction by a general surgeon, Dr. Surykant J. Patel, M.D. (JA 320–24.)  Next, while in the process of removing a cystic mass in the right pelvic area, Dr. Aron reported cutting and tying-off a number of unidentified vessels. (JA 321.) While Dr. Aron noted in his Operative Report at the conclusion of the Pfenninger surgery that "[t]he major vessels and ureter appeared to be uninjured[,]" a four-centimeter section of Ms. Pfenninger's healthy right ureter was later discovered among the surgical waste from the procedure. (JA 266–67, 321, 328–29.) According to Dr. Aron, the risk of injury to

the ureter from this type of surgery was very low, "probably in the one percent." (JA 256–57.)

### 2.    Dr. Aron Received Notice That The Ureter Was Severed.

The injury to Ms. Pfenninger's ureter was discovered by Civista Medical Center pathologist Dr. Kausha Patel, M.D., who examined the piece of bowel and the cystic mass that Dr. Aron removed in the surgery. (JA 328–29.) On January 3, 2011, Dr. Patel informed both Dr. Aron and the other Dr. Patel, who assisted in Ms. Pfenninger's surgery, that she had identified a four-centimeter segment of healthy ureter among the specimens. (JA 328–29.) The pathologist's involvement brought to Dr. Aron's attention two key facts about this incident. First, Dr. Aron testified in his deposition that he understood the ureter had been cut and tied off. (JA 268.) Second, Dr. Aron testified in his deposition that he understood his Operative Report was inaccurate where it indicated "[t]he major vessels and ureter appeared to be uninjured." (JA 266–67.)

### 3.    Dr. Aron Knew That The Ureter Required Reconstruction.

By the time Dr. Aron received the pathologist's report, Ms. Pfenninger had already been discharged from the Medical Center and sent home to recover. (JA 325–26.) Dr. Aron consulted with a radiologist and urologist about what to do. (JA 326.) Both specialists recommended that Ms. Pfenninger be readmitted to the Medical Center for the placement of a nephrostomy tube, a type of catheter inserted directly into her kidney through her back. (JA 326.) The nephrostomy tube would allow urine

to drain into an external plastic bag until Ms. Pfenninger's ureter could be surgically reconstructed. (JA 326.) Dr. Aron contacted Ms. Pfenninger and advised that she return to the Medical Center immediately for the placement of the nephrostomy tube. (JA 269–70.)

### 4. __Dr. Aron Knew That The Ureter Being Severed Was Significant For Insurance And Peer Review Purposes.__

Dr. Aron reported eight or more incidents to his insurers before the *Pfenninger* Matter, so he understood their significance for insurance purposes. (JA 242–43, 254–255, 388–89.) In fact, Dr. Aron only came to be insured by Catlin in the first place as a result of being non-renewed by his prior insurer that had covered him for fifteen years. (JA 250–54.) In Dr. Aron's own words, the non-renewal occurred because "there had been an accident" that led the Maryland Board of Physicians to place his license on probation. (JA 252–54.) Moreover, at least one of the prior claims against Dr. Aron involved injury to a patient's ureter during the same type of procedure that injured Ms. Pfenninger. (JA 242.) In that case, Dr. Aron's insurer paid a settlement. (JA 242–43.) As a result of these experiences, Dr. Aron is not the type of insured who can credibly claim to be ignorant about any aspect of the insurance process or its consequences, including but not limited to the mechanics of reporting claims and incidents to his insurer.

Further, Dr. Aron testified in his deposition that he was familiar with the Medical Center's peer review and medical risk management procedures that were

likely triggered in regard to Ms. Pfenninger's injury. (JA 206–232.) Specifically, he testified about "incident" or "occurrence" reports that are used for peer review when events such as medical complications occur that warrant further evaluation. (JA 216–18.) "[B]asically, if there's an <u>incident</u>, it gets reported to quality management." (JA 220–21.) (emphasis added.) From there it is referred for peer review to the Medical Review Committee that investigates incidents like "surgical or medical complications or maybe a patient death[.]". (JA 206, 221.) Because Dr. Aron has served on the Medical Review Committee, he was asked a number of times in his deposition what kind of reports, analyses or other peer review or risk management procedures were or should have been undertaken in regard to the Pfenninger incident. (JA 261–65, 297.) In each instance, Dr. Aron's counsel instructed him not to answer based on the medical peer review privilege. (JA 261–65, 297.) These exchanges, taken as a whole, lead to the inescapable conclusion that peer review was conducted in Ms. Pfenninger's case and that Dr. Aron knew it. Otherwise, there would have been no basis for Dr. Aron's counsel to assert the privilege.

## B.   DR. ARON OBTAINED MEDICAL MALPRACTICE INSURANCE FROM CATLIN.

Since January 1, 2010, Catlin issued four separate Individual Physicians Professional Liability Policies to Dr. Aron that provide limited coverage on a claims-made-and-reported basis. Each had a policy period of one year, from January 1 to January 1. Dr. Aron applied for each policy individually, during the preceding policy

year, and they were entered into by the parties as separate and independent contracts.

Importantly, Dr. Aron concedes that the third policy—the one incepting on January 1, 2012, and expiring on January 1, 2013 (hereinafter, the "2012 Policy")—is the one that controls the outcome of this insurance coverage action. (JA 141.)

The basic grant of coverage in the 2012 Policy's Insuring Clause provides, in pertinent part, as follows:

> The Company, subject to the exclusions, limits of liability, and other terms and conditions hereof, will pay on behalf of the **Insured** those sums which the **Insured** is legally obligated to pay as **damages** because of a **loss event** within the **policy territory**, to which this insurance applies, subsequent to the **retroactive date** and for which a **claim** is first made in writing during the policy period and reported to the Company in writing during the policy period or any applicable **extended reporting period**.

(JA 99.) (emphasis in original.)

Importantly, defined terms in the 2012 Policy are bolded in the policy text, and their definitions appear in a separate section. For instance, the definition of the term "claim" provides as follows:

A. "**claim**" means:

1. the filing of a lawsuit against an **Insured**, and/or
2. **written notice** of intent to file a lawsuit or to arbitrate against an **Insured**, and/or
3. a written demand for money or services delivered to an **Insured**, and/or
4. **written notice** of a **loss event** from the **Named Insured**, **Additional Insured** or **Additional Named Insured** detailing the name of a patient,

> witnesses and the circumstances under which the
> **Insured** became aware of **injury** suffered; and
>
> as a result of a **loss event** which occurred subsequent to
> the **retroactive date** of this Policy and which has been
> reported to the Company in writing, prior to the
> **expiration date** or the expiration of an applicable
> **Extended Reporting Period** Endorsement.

(JA 105–06.) (emphasis in original.)

The 2012 Policy further specifies when a "claim" is to be considered first-made and reported. (JA 103–04.) A claim is to be considered first-made when, for example, Dr. Aron receives "a written demand for money or services from a claimant or claimant's attorney or agent." (JA 103.) A claim is to be considered reported "on the date when the Company first receives **written notice** from a **Named Insured**, **Additional Insured** or **Additional Named Insured** that a **claim** has been made against an **Insured** as a result of an alleged **loss event** to which this Policy applies." (JA 104.) (emphasis in original.)

In addition, some matters are excluded from coverage by the 2012 Policy's exclusions. (JA 99–103.) Exclusion 11 specifies that the Policy does not provide coverage for or apply to "**claims**, incidents or **loss events** which were first brought to the attention of the **Insured** or reported to another insurer prior to the **inception date**[.]" (JA 100.) (emphasis in original.)

8

## C.   DR. ARON RECEIVED REPEATED CORRESPONDENCE FROM MS. PFENNINGER'S LAWYERS REGARDING THE INCIDENT.

Dr. Aron received multiple letters from Ms. Pfenninger's lawyers in 2012 regarding the incident that he did not report to Catlin until 2013. The letters were a request for medical records and two threatening demand letters. (JA 33–35, 37, 159.) First, Dr. Aron received the request for medical records dated August 22, 2012. (JA 159.) In the opening paragraph, Ms. Pfenninger's attorney states that "[t]his office represents Ms. Pfenninger for her personal injuries." (JA 159.) Next, Dr. Aron received a demand letter from Ms. Pfenninger's counsel dated November 26, 2012. (JA 33–35.) "As you are aware," the letter opens, "our office represents Ms. Pfenninger for the injuries she suffered when you mistakenly resected her ureter. She has authorized our office to accept $725,000." (JA 33.) The letter closes with "[i]t is our intention to bring a medical negligence claim for her injuries. . . . We will provide you thirty days to respond to this demand before the claim is filed." (JA 34–35.) When Dr. Aron did not respond, he received a second demand letter dated January 4, 2013. (JA 37.) The second demand letter simply confirmed what Dr. Aron had known since the incident involving Ms. Pfenninger's ureter was first brought to his attention, which is that a lawsuit, if settlement did not occur, would very likely be brought against him.

## D.  DR. ARON DELAYED REPORTING THE PFENNINGER INCIDENT TO CATLIN.

The above-referenced events spanned the expiration of three separate Catlin policies, and Dr. Aron's sole correspondence with Catlin during that time consisted of two renewal applications in which he made no mention of Ms. Pfenninger's surgery, the incident involving her ureter, or any of the correspondence he received from Ms. Pfenninger's counsel. The effect of this two year delay was for Catlin to issue successive renewal policies to Dr. Aron that were not priced to account for a practically certain exposure that Dr. Aron had notice and knowledge of, but that he kept from Catlin.

### 1.  The 2011 Renewal Application.

Dr. Aron submitted a renewal application to Catlin signed and dated November 11, 2011, which was over 11 months after the Pfenninger incident had been brought to his attention by the pathologist's report. (JA 347–54.) Dr. Aron admittedly made no mention of the Pfenninger incident on this application. (JA 291.) Further, Dr. Aron made warranties in the renewal application that use the word "incident," and that indicate his agreement that incidents such as the Pfenninger incident would be excluded from coverage if his policy were renewed. (JA 353–54.) Specifically, Dr. Aron warranted and agreed as follows:

> I also warrant that any and all acts, <u>incidents</u> and/or circumstances, of which I am aware, and which might reasonably be expected to result in a claim under the prior acts coverage afforded by any policy issued were disclosed

10

to Catlin Underwriting Agency, U.S., Inc. prior to the effective date of such coverage and are listed below:

[Dr. Aron Left This Space Blank]

These warranties are material to the acceptance of coverage by the insurer, and are made a part of the insurance policy.

Further, I acknowledge and agree that any claims resulting from acts committed prior to the effective date of coverage, and of which I was aware, are specifically excluded from coverage under this policy and any applicable policy written to provide coverage in excess of this policy.

(JA 353–54.) (emphasis added.) By this point, Dr. Aron knew that Ms. Pfenninger's surgery had serious complications, that his Operative Report had a factual inaccuracy that directly concerned one of those complications, that the intervention of four other specialists was required for his patient to receive corrective treatment, and that his patient had to be readmitted to Civista Medical Center for additional, unplanned surgery.

## 2.    The 2012 Renewal Application.

Dr. Aron submitted another renewal application after the Pfenninger surgery that was signed and dated November 7, 2012. (JA 126–29.) This renewal application is significant because Dr. Aron had received the request for medical records from Ms. Pfenninger's counsel by that point, and he checked a box marked "Yes" in response to the question "Have there been any claims made against you or incidents likely to result in a claim against you during the past year?" (JA 126.) Dr. Aron testified in his deposition that he receives requests for medical records from patients and their

11

attorneys routinely, and that he attaches no special significance to them. (JA 247–50.) However, he also testified in his deposition that he checked the box on his renewal application specifically because of the request from Ms. Pfenninger's counsel. (JA 292–94.) These two statements are only reconcilable if Dr. Aron already knew— before even receiving the medical records request in regard to Ms. Pfenninger—that an incident had occurred in his treatment of her to warrant special concern.

**E.    CATLIN DENIED COVERAGE.**

Dr. Aron's first report of the Pfenninger matter to Catlin was his loss notice on January 7, 2013. (JA 39–48.) Dr. Aron's loss notice included the letter from Ms. Pfenninger's counsel dated November 26, 2012, as well as the letter from Ms. Pfenninger's counsel dated January 4, 2013. (JA 40–43.) Dr. Aron's loss notice did not include the request for medical records dated August 22, 2012. Catlin denied coverage for the Pfenninger matter on February 1, 2013. (JA 121–24.)

## IV.  SUMMARY OF ARGUMENT

Under the clear and unambiguous terms of the 2012 Policy, there is no coverage for the *Pfenninger* Matter because it did not result in a claim being both first-made in writing and reported to Catlin in writing during the policy period. The District Court found coverage by wrongly concluding that the 2012 Policy's reporting requirement is unenforceable in this case by operation of MD. CODE INS. § 19–110, which makes prejudice to the insurer a prerequisite to denying coverage for an insured's breach of notice conditions. Because a matter cannot meet the 2012 Policy's

definition of "claim" unless it has been reported to Catlin in writing during the policy period, the reporting requirement—contrary to the District Court's ruling—is no mere notice condition. Rather, it establishes that the *Pfenninger* Matter never triggered the 2012 Policy in the first instance. Since one cannot breach an insurance policy that expired before the occurrence of its trigger event, MD. CODE INS. § 19–110 does not apply to the *Pfenninger* Matter, and the 2012 Policy affords no coverage for it.

In addition, the District Court wrongly found that the 2012 Policy's exclusion was ambiguous for incidents that were brought to the attention of the insured before the 2012 Policy's inception date. The District Court then compounded its error by interpreting the word "incident" against Catlin in a manner that is contrary to its ordinary, accepted meaning, and without giving due consideration to evidence that the parties understood the word "incident" to include matters such as the *Pfenninger* Matter. Because the incident that underlies the *Pfenninger* Matter was brought to Dr. Aron's attention by the pathologist's report in 2011, and the 2012 Policy excludes incidents that were brought to Dr. Aron's attention before the inception date, the District Court was incorrect to find any coverage for the *Pfenninger* Matter under the 2012 Policy.

For the foregoing reasons, set forth more fully below, the District Court's grant of summary judgment to the Aron Appellees and its denial of summary judgment to Appellant are improper, and should be REVERSED.

13

## V.  ARGUMENT

Catlin respectfully contends that this Honorable Court should reverse the District Court's grant of summary judgment to the Aron Appellees and its denial of Catlin's cross motion because, as a matter of law, there is no coverage for the *Pfenninger* Matter. First, the *Pfenninger* Matter did not result in a claim that was both first-made in writing and reported to Catlin in writing during the policy period as required to trigger Catlin's policy. In addition, because the incident that underlies the *Pfenninger* Matter was brought to Dr. Aron's attention before the policy incepted, it is excluded from coverage by the policy's exclusions. For these two independent reasons, summary judgment is warranted in Catlin's favor but not in the Aron Appellees' favor. Therefore, the Order of the District Court should be REVERSED.

### A.  STANDARD OF REVIEW.

The District Court's summary judgment rulings are subject to *de novo* review by this Court. *Seabulk Offshore, Ltd. v. American Home Assur. Co.*, 377 F.3d 408, 418 (4th Cir. 2004). When opposing parties both file motions for summary judgment, as in this case, each is to be considered "separately on its own merits to determine whether either [party] deserves judgment as a matter of law." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003), *cert. den'd*, 540 U.S. 822 (2003). Summary judgment is appropriate under this standard if there is no genuine dispute as to any material fact. FED. R. CIV. P. 56(c)(2). A material fact is one that "might affect the outcome of the suit under the governing law[,]" and a genuine dispute exists "if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Notably, under applicable Maryland law, the insured has the initial burden to show that a matter is within the coverage of an insurance contract. *See Prop. & Cas. Ins. Guar. Corp. v. Beebe-Lee*, 431 Md. 474, 490, 66 A.3d 615, 624 (Md. Ct. App. 2013).

**B.    BECAUSE THE *PFENNINGER* MATTER DID NOT RESULT IN A CLAIM THAT WAS FIRST-MADE AGAINST THE INSUREDS AND REPORTED TO CATLIN DURING THE POLICY PERIOD OF THE 2012 POLICY, THE DISTRICT COURT ERRED IN HOLDING THAT THE 2012 POLICY AFFORDS ANY COVERAGE FOR THE *PFENNINGER* MATTER.**

The 2012 Policy provides that matters must be reported to Catlin in writing during the policy period in order to constitute a "claim" that triggers coverage. Because the *Pfenninger* Matter was not reported to Catlin until after the policy period, it cannot be construed to trigger the 2012 Policy in the first instance. Therefore, MD. CODE INS. § 19–110 does not require that Catlin show prejudice in order to deny coverage, because MD. CODE INS. § 19–110 only applies to notice conditions that are separate from a liability policy's trigger event. The District Court's extension of MD. CODE INS. § 19–110 to policy provisions like Catlin's is contrary to Maryland law, and there is no controlling precedent for it.

### 1.    The *Pfenninger* Matter Is Not Covered By The 2012 Policy's Insuring Clause.

In its Insuring Clause, the 2012 Policy provides in clear and unambiguous terms that subject to the exclusions, limits of liability, and other terms and conditions

thereof, the 2012 Policy only affords coverage for claims that were both first made in writing and reported to Catlin in writing during the policy period that ran from January 1, 2012, to January 1, 2013. (JA 94, 99.) Crucially, the word "claim" as used in the 2012 Policy is a defined term, and a claim in the generic sense is only a "claim" if it is both first-made and reported during the policy period. (JA 105–06.) A "claim" is considered first-made under the 2012 Policy when, for example, Dr. Aron receives "a written demand for money or services from a claimant or claimant's attorney or agent." (JA 103.) A "claim" is considered reported "on the date when the Company first receives **written notice** from a **Named Insured**, **Additional Insured** or **Additional Named Insured** that a **claim** has been made against an **Insured** as a result of an alleged **loss event** to which this Policy applies."  (JA 104.) (emphasis in original.)

Applying these provisions to the facts of the *Pfenninger* Matter leads to the inescapable conclusion that the 2012 Policy was never triggered in regard to the *Pfenninger* Matter. Dr. Aron admittedly received a written demand for money from Ms. Pfenninger's counsel in 2012, during the policy period. (JA 288–90.) However, Catlin did not receive written notice of any such demand until 2013, after the 2012 Policy had expired. (JA 39.) Because a matter cannot be a "claim" within the Insuring Clause of the 2012 Policy without being both first-made and reported during the policy period, the 2012 Policy was not triggered in regard to the *Pfenninger* Matter, and Catlin does not have any obligation to provide coverage for it.

16

2. **MD. CODE INS. § 19–110 Does Not Apply To Require That Catlin Show Prejudice.**

The District Court wrongly concluded that the 2012 Policy affords coverage for the *Pfenninger* Matter because, in the District Court's view, MD. CODE INS. § 19–110 applies to require that Catlin show prejudice to deny coverage for the non-fulfillment of the 2012 Policy's reporting requirement. (JA 397–401.) MD. CODE INS. § 19–110 states as follows:

> An insurer may disclaim coverage on a liability insurance policy on the ground that an insured or a person claiming the benefits of the policy through the insured *has breached the policy* by failing to cooperate with the insurer or by not giving the insurer required notice only if the insurer establishes by a preponderance of the evidence that the lack of cooperation or notice has resulted in actual prejudice to the insurer.

MD. CODE INS. § 19–110 (emphasis added). This statute has been interpreted by the Maryland state courts in two seminal opinions. (JA 397–99.) Those opinions were issued by the Maryland Court of Appeals in *Sherwood Brands, Inc. v. Great Am. Ins. Co.*, 418 Md. 300, 13 A.3d 1268 (Md. Ct. App. 2011), and in *T.H.E. Ins. Co. v. P.T.P., Inc.*, 331 Md. 406, 628 A.2d 223 (Md. Ct. App. 1993).

In *T.H.E.*, the Maryland Court of Appeals held that the precursor to MD. CODE INS. § 19–110 did not apply where a claims-made-and-reported policy had expired before the claim in issue was reported. 331 Md. at 415, 628 A.2d at 228. This Court and the United States District Court for the District of Maryland both relied on *T.H.E.* to hold that MD. CODE INS. § 19–110 did not apply to claims-made-and-

17

reported policies at all. *See Janjer Enters., Inc. v. Executive Risk Indem., Inc.*, 97 F. App'x 410, 414 (4th Cir. 2004); *Maynard v. Westport Ins. Corp.*, 208 F. Supp. 2d 568, 574 (D. Md. 2002). While the Maryland Court of Appeals clarified in *Sherwood Brands* that MD. CODE INS. § 19–110 applies to all liability policies, it expressly did not disavow the outcome of *T.H.E.* or overrule it:

> We hold that § 19–110 does not apply, as was the case in *T.H.E.*, to claims-made policies in which the act triggering coverage—usually notice of a claim or suit being filed against and served upon an insured under third-party liability policies—does not occur until after the expiration of the liability policy, as this non-occurrence of the condition precedent to coverage is not a "breach of the policy," as required by the statute. On the other hand, we hold that § 19–110 does apply, as is the case at present, to claims-made policies in which the act triggering coverage occurs during the policy period, but the insured does not comply strictly with the policy's notice provisions. In the latter situation, § 19–110 mandates that notice provisions be treated as covenants, such that failure to abide by them constitutes a breach of the policy sufficient for the statute to require the disclaiming insurer to prove prejudice.

*Id.* at 333, 13 A.3d at 1288.

The critical distinction between *Sherwood Brands* and *T.H.E.*, based on the Court's holding above, is that *Sherwood Brands* concerned a notice condition that was independent from the act triggering coverage, whereas *T.H.E.* concerned the act triggering coverage itself. As the Maryland Court of Appeals correctly noted in *Sherwood Brands*, the act triggering coverage in claims-made policies is "*usually* notice of a claim or suit being filed against and served upon an insured." *Id.* (emphasis added.)

18

That was true in regard to the *Sherwood Brands* policy, where the reporting condition was separate from the definition of claim.[2] *Id.* (emphasis added.) However, there is nothing in the *Sherwood Brands* opinion or any other controlling Maryland authority to prevent contracting parties from agreeing on a different definition of claim that integrates a reporting requirement.

Since the *Sherwood Brands* case was decided, this Honorable Court has not yet reached the issue of whether MD. CODE INS. § 19–110 applies to claims-made-and-reported policies that are similar to Catlin's. The United States District Court for the District of Maryland has done so on four prior occasions. In two cases the District Court found that MD. CODE INS. § 19–110 did not apply, and in another two cases the District Court found that it did. *Compare Fin. Indus. Regulatory Auth., Inc. v. Axis Ins. Co.*, 951 F. Supp. 2d 826, 838 (D. Md. 2013) *and Minnesota Lawyers Mut. Ins. Co. v. Baylor & Jackson, PLLC*, 852 F. Supp. 2d 647, 662 (D. Md. 2012) (both holding that MD. CODE INS. § 19–110- did not apply), *with Navigators Specialty Ins. Co. v. Med. Benefits Adm'rs of MD, Inc.*, 2014 WL 768822 (D. Md. 2014) *and McDowell Bldg., LLC v. Zurich Am. Ins. Co.*, 2013 WL 5234250 (D. Md. 2013) (both holding that MD. CODE INS. § 19–110 did apply in unpublished opinions, filed and served herewith in accordance with FED. R. APP. P. 32.1).

---

[2]     While the applicable policy in *Sherwood Brands* had an alternative definition of claim that included a reporting requirement, that definition was not implicated by the facts of the case, so the Maryland Court of Appeals did not address it. 418 Md. at 332, 13 A.3d at 1268.

Notably, the *Minnesota Lawyers* case reached this Court on appeal, but the Court did not decide the issue of whether MD. CODE INS. § 19–110 applied or not. 531 Fed. App'x 312, 319 (4th Cir. 2013). This Court did suggest, however, in *obitur dicta*, that "the circumstances under which insurers are required to provide such demonstration [of prejudice] depends on the language of the policy at issue." *Id.* This analysis is correct, and demonstrates that MD. CODE INS. § 19–110 does not apply to this matter notwithstanding the District Court's opinion.

Catlin respectfully contends that the District Court erred in applying *Sherwood Brands* and *T.H.E.* to this matter by conflating notice conditions—which are separate from the definition of claim—with reporting requirements that are integrated into the definition of claim. Notice conditions that are separate from the definition of claim are converted into covenants pursuant to *Sherwood Brands*, so their non-occurrence becomes a *breach of the policy* within the ambit of MD. CODE INS. § 19–110. *See* 418 Md. at 300, 13 A.3d at 1268. A reporting requirement in the definition of "claim" itself is different. In the wake of *Sherwood Brands* and *T.H.E.*, the existence of a "claim" is treated in Maryland law as the trigger event of a claims-made policy. Because no Maryland state court has ever applied MD. CODE INS. § 19–110 to alter a claims-made policy's trigger event, to do so here with respect to Catlin's policy is unprecedented.

Maryland's overriding public policy in insurance coverage matters is to enforce the intent of the contracting parties as shown by unambiguous policy language. *See, e.g.*, *Nat'l Cas. Co. v. Lockheed Martin Corp.*, 799 F. Supp. 2d 537, 542 (D. Md. 2011).

20

Because neither the Maryland legislature nor any Maryland state court has extended MD. CODE INS. § 19–110 to contravene an unambiguous reporting requirement in the definition of claim like the 2012 Policy provides, the District Court erred in making that leap. Therefore, no showing of prejudice is necessary for the non-existence of coverage to be established in this case based on the uncontroverted facts and clear policy language. Any holding to the contrary would create new law in Maryland, it would negate the parties' contractual intent in this case, and it would make true claims-made-and-reported policies unavailable to the Maryland insurance market.

For the foregoing reasons, because the *Pfenninger* Matter did not result in a claim that was first-made against the insureds and reported to Catlin during the policy period, the District Court erred in holding that the 2012 Policy affords coverage for the *Pfenninger* Matter. The District Court's grant of summary judgment in favor of the Aron Appellees and its denial of summary judgment against Appellant are incorrect, and should accordingly be REVERSED.

## C. BECAUSE THE 2012 POLICY EXCLUDES INCIDENTS THAT WERE BROUGHT TO THE ATTENTION OF THE INSUREDS BEFORE THE 2012 POLICY'S INCEPTION DATE, THE DISTRICT COURT ERRED IN HOLDING THAT THE 2012 POLICY AFFORDS ANY COVERAGE FOR THE *PFENNINGER* MATTER.

The District Court wrongly found that the word "incident" in the 2012 Policy's exclusion for incidents that were brought to the attention of the insured before the 2012 Policy's inception date was ambiguous, and held it does not apply to the *Pfenninger* Matter. In doing so, the District Court interpreted the word "incident"

21

against Catlin without giving due consideration to evidence demonstrating that the events of the *Pfenninger* Matter constituted an "incident" in any ordinary meaning of the term, and also that Dr. Aron understood them to be an "incident" as that term is used specifically for insurance and medical risk management purposes. Because the *Pfenninger* Matter was brought to Dr. Aron's attention as an incident before the 2012 Policy's inception date, the *Pfenninger* Matter is excluded from coverage by the policy's exclusions.

### 1.   The *Pfenninger* Matter Is Based On An Incident.

Exclusion 11 specifies that the 2012 Policy does not provide coverage for or apply to "**claims**, incidents or **loss events** which were first brought to the attention of the **Insured** or reported to another insurer prior to the **inception date**[.]" (JA 100.) (emphasis in original.) The inception date is the date that the 2012 Policy became effective, as stated in the Declarations, which was January 1, 2012. (JA 94, 106.) Although the term "incident" is not defined in the 2012 Policy, the events surrounding Ms. Pfenninger's surgery were an "incident" under the usual, ordinary and accepted meaning of the word, which is controlling in Maryland where the parties have not used the word in a technical sense. *Pac. Indem. Co. v. Interstate Fire & Cas. Co.*, 302 Md. 383, 388, 488 A.2d 486, 488 (Md. Ct. App. 1985). Catlin respectfully contends that the District Court erred in applying its own specialized meaning to the word "incident" where there is no evidence that the parties intended to use it in that sense.

22

Alternatively and in addition, when a term is not defined in an insurance policy and susceptible to multiple meanings, it is still not ambiguous if "there is an indication that the parties intended to use the [term] in a technical sense." *Sullins v. Allstate Ins. Co.*, 340 Md. 503, 508 (Md. Ct. App. 1995). The District Court inappropriately imposed its own specialized meaning on the term "incident" without giving proper consideration to evidence that the parties understood the word "incident" to have technical meaning in the medical malpractice context, specifically as a result of being used for insurance applications, peer review, and medical risk management procedures. *See supra,* pp. 5–6, 10–12. Accordingly, a jury could reasonably disagree with the District Court's conclusion, and find that the circumstances underlying the *Pfenninger* Matter were an "incident" as that term is used and understood by the parties.

## 2. The Incident Was Brought To Dr. Aron's Attention Before The 2012 Policy Incepted.

Dr. Aron was the central, active participant in Ms. Pfenninger's treatment, so the complications in her care were promptly brought to his attention as they occurred in December of 2010 and January of 2011. First, the bowel perforation was brought to Dr. Aron's attention during the surgery, on December 30, 2010, when he had to call for the intra-operative assistance of Dr. S. J. Patel. (JA 320–25.) Next, Dr. Aron learned about the complications with Ms. Pfenninger's ureter from the pathologist's report on January 3, 2011. (JA 328–29.) Dr. Aron knew that Ms. Pfenninger needed to

be readmitted for the placement of a nephrostomy tube, and that her ureter would ultimately require surgical reconstruction. (JA 326.)

Moreover, Dr. Aron knew that Ms. Pfenninger's complications were an incident. First, Dr. Aron's checking of the box on his renewal application dated November 7, 2012, to indicate that a claim would likely be made against him demonstrates that he knew, long before he ever received the medical records request that supposedly led him to check that box, that the Pfenninger surgery had resulted in an incident. Dr. Aron routinely gives no special weight to medical records requests, yet he gave this particular request extraordinary weight. (JA 247–50.) The only credible explanation is that Dr. Aron already knew when he received the request from Ms. Pfenninger's counsel that her case presented an incident of special significance for insurance and medical risk management purposes. Further, Dr. Aron knew from the moment that he received the pathology report, on January 3, 2011, that Ms. Pfenninger had suffered an injury to her ureter that was similar to one that had previously led to a claim being made against him, and that had resulted in a settlement being paid by his insurer. (JA 242–43). Therefore, Dr. Aron was aware almost a year before the 2012 Policy incepted that the Pfenninger surgery was an incident with insurance implications.

Still further indication that Dr. Aron understood Ms. Pfenninger's complications were an incident is found in his attorney's invocation of the medical peer review privilege during Dr. Aron's deposition. (JA 261–65, 297.) Counsel could

not have raised any such objection unless peer review was actually done in Ms. Pfenninger's case, since privileges cannot be asserted as to materials that do not exist. Because the peer review process necessarily would have framed the Pfenninger surgery as an "incident," and because Dr. Aron testified he was familiar with the peer review process and knew what types of incidents were subject to it, Dr. Aron knew the Pfenninger surgery was an incident immediately upon receipt of the pathologist's report on January 3, 2011.

For the foregoing reasons, the term "incident" is not ambiguous as the District Court has held, either by application of the ordinary accepted meaning or the technical meaning that the parties ascribed to it. The *Pfenninger* Matter is excluded from coverage because the underlying incident was brought to the attention of the insureds before the 2012 Policy's inception date or, at the very least, a jury could find to that effect based on a genuine dispute of material fact. The exclusion of incidents brought to the attention of the insureds before the policy's inception date operates to enforce the most fundamental premise of insurance, which is to cover fortuitous, contingent, or accidental losses only. "Insurers do not usually contract to cover preexisting risks and liabilities known by the insured." *Bryan Bros. Inc. v. Cont'l Cas. Co.*, 660 F.3d 827, 831 (4th Cir. 2011). *See also Culver v. Cont'l Ins. Co.*, 11 F. App'x 42, 45–46 (4th Cir. 1999) (upholding a similar exclusion).

The District Court's grant of summary judgment in favor of the Aron Appellees and its denial of summary judgment to Appellant are incorrect, and should accordingly be REVERSED.

## VI.  CONCLUSION

For the foregoing reasons, the District Court's grant of summary judgment in favor of the Aron Appellees and its denial of summary judgment to Appellant should be REVERSED.

Respectfully submitted, November 19, 2014.

/s/ Matthew R. Gambale
GREGORY W. BROWN
NC Bar # 26238  / VA Bar # 36369
MATTHEW R. GAMBALE
NC Bar # 43359
BROWN LAW LLP
4130 Parklake Avenue, Suite 130
Raleigh, North Carolina 27612
T: 919.719.0854
F: 919.719.0858
gregory@brownlawllp.com
gambale@brownlawllp.com

THOMAS P. BERNIER
Maryland Bar # 02141
SEGAL, MCCAMBRIDGE, SINGER & MAHONEY, LTD
One North Charles Street, Suite 2500
Baltimore, Maryland 21201
T: 410.779.3960
F: 410.779.3667
tbernier@smsm.com

*Counsel for Catlin Specialty Insurance Company*

26

## <u>REQUEST FOR ORAL ARGUMENT</u>

In accordance with Fourth Circuit Local Rule 34(a), Appellant Catlin Specialty Insurance Company hereby requests that the Honorable Court hold oral argument of this matter. In support of this request, Catlin respectfully submits that oral argument is warranted for no fewer than two important reasons. First, this matter seeks clarification of a rule of law within this Circuit, and second, this matter involves a legal issue of continuing public interest.

As noted above, the United States District Court for the District of Maryland has issued contradictory opinions as to whether MD. CODE INS. § 19–110 applies to the reporting requirement in insurance policies like those issued by Catlin to the Aron Appellees. *See supra,* p. 19. A ruling from this Court is necessary to resolve the contradictory precedent from the District Court, and to provide clarification of the applicable rule of law.

Moreover, this matter involves a legal issue of continuing public interest. The contradictory opinions from the District Court on the applicability of MD. CODE INS. § 19–110 leave Maryland insurers and insureds without clear direction for their contracting behavior going forward. Such uncertainty could affect whether adequate medical malpractice insurance remains available and affordable in Maryland for the protection of Maryland physicians and patients.

/s/ Matthew R. Gambale
MATTHEW R. GAMBALE

## <u>CERTIFICATE OF COMPLIANCE</u>

1.      This brief complies with the type-volume limitations of FED. R. APP. P. 32(a)(7)(B) because the brief contains 6,680 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of FED. R. APP. P. 32(b)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because the brief has been prepared in proportionally-spaced typeface using Microsoft Word in 14 point Garamond font.

    <u>/s/ Matthew R. Gambale  </u>
    MATTHEW R. GAMBALE

28

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on November 19, 2014, a copy of the foregoing **OPENING BRIEF OF APPELLANT CATLIN SPECIALTY INSURANCE COMPANY** was filed electronically via the Court's case management system and served on all parties as follows:

Geoffrey H. Genth
M. Natalie McSherry
Patrice Meredith Clark
KRAMON & GRAHAM, P.A.
One South Street, Suite 2600
Baltimore, Maryland 21202–3201
ggenth@kg-law.com
nmcsherry@kg-law.com
pclarke@kg-law.com
*Counsel for Barry I. Aron, M.D. and Barry I. Aron, M.D., P.C.*

Patrick A. Malone
Alfred C. Clarke
PATRICK MALONE & ASSOCIATES, P.C.
1111 16th Street, NW, Suite 400
Washington, D.C. 20036
pmalone@patrickmalonelaw.com
aclarke@patrickmalonelaw.com
*Counsel for Sherry Pfenninger and Jerry Pfenninger*

/s/ Matthew R. Gambale
MATTHEW R. GAMBALE

# ADDENDUM

Memorandum Opinion, *McDowell Building, LLC v. Zurich American Insurance Co.*, 2013WL 5234250, US District Court, D. Maryland, Decided September 17, 2013

Memorandum Opinion, *Navigators Specialty Insurance Co. v. Medical Benefits Administrators of MD, Inc. et al.*, 2014 WL 768822 US District Court, D. Maryland Decided February 21, 2014

2013 WL 5234250
Only the Westlaw citation is currently available.
United States District Court,
D. Maryland.

McDOWELL BUILDING, LLC, Plaintiff,

v.

ZURICH AMERICAN INSURANCE CO., Defendant.

Civil Action No. RDB–12–2876.   |   Sept. 17, 2013.

### MEMORANDUM OPINION

RICHARD D. BENNETT, District Judge.

 **\*1**  This is a diversity action brought by Plaintiff McDowell Building, LLC ("McDowell") against Zurich American Insurance Co. ("Zurich") for breach of an architect's malpractice insurance policy. McDowell alleges that it was harmed by the negligence of its architect, and that Zurich wrongfully denied coverage under the policy. Pending before this Court is Zurich's Motion to Dismiss (ECF No. 6) pursuant to Federal Rule of Civil Procedure 12(b)(6). In support of its Motion, Zurich argues that it did not receive timely notice of the claim and its denial of coverage was justified under Maryland law. In response, McDowell argues that dismissal at this stage would be improper because Section 19–110 of the Insurance Article of the Maryland Code (" § 19–110") prohibits insurance companies from denying coverage based on untimely notice unless there is a showing of actual prejudice. The parties' submissions have been reviewed and no hearing is necessary. *See* Local Rule 105.6 (D.Md.2011). For the reasons that follow, Defendant Zurich American Insurance Co.'s Motion to Dismiss (ECF No. 6) is DENIED.

### BACKGROUND

This Court accepts as true the facts alleged in the plaintiff's complaint. *See Aziz v. Alcolac, Inc.,* 658 F.3d 388, 390 (4th Cir.2011). Plaintiff McDowell is a real estate developer involved in a project known as the "McDowell Building," located in the Mt. Vernon neighborhood of Baltimore, Maryland. Pl.'s Compl. ¶¶ 2, 4. In order for the project to be financially viable, McDowell required certain state and federal historic preservation credits, worth $625,000. *Id.* ¶ 5. Accordingly, McDowell hired DR Brasher, Inc., d/b/a Brasher Design, ("Brasher Design") to complete the

applications necessary for obtaining the required credits. *Id.* ¶ 6. Karen Starika, an employee of Brasher Design, was tasked with preparing and filing the applications. *Id* . ¶ 8.

On September 23, 2004, Brasher Design discovered that the Maryland Historical Trust ("MHT"), the agency that oversees the Maryland tax credits, had no application for the McDowell project on file. *Id.* ¶ 9. MHT further declared that it was now too late for McDowell to apply for the tax credit. *Id.*

Initially, McDowell brought suit against MHT in the Maryland courts, seeking a writ of mandamus and a declaratory judgment forcing MHT to process McDowell's Maryland tax credit application. Pl.'s Compl. ¶ 10. On June 27, 2006, however, Frank Zokaites, an individual member of McDowell, filed a cross-claim and third party complaint (the "Zokaites Complaint") against Brasher Design on behalf of himself and McDowell. *Id.* ¶ 11. The Zokaites Complaint included a professional negligence claim against Brasher Design, which was contingent upon the state court finding that no tax credit application had been filed. *Id.* The court severed the Zokaites Complaint and stayed it pending resolution of McDowell's suit against MHT. *Id.* ¶ 13.

 **\*2**  Brasher Design was covered by a series of consecutive one-year Architects and Engineers Professional Liability insurance policies from the time of initial discovery in September 2004 to the commencement of the suit against Brasher Design in June 2006. *Id.* ¶ 17. Brasher Design's original policy with Zurich, the 2004–05 Policy, was effective July 6, 2004 to July 6, 2005, while its 2005–06 Policy was effective July 6, 2005 to July 6, 2006. *Id.* ¶¶ 18–19. The Retroactive Date for both of these policies was July 5, 1988. Pl.'s Compl. Ex. B, p. 3; Ex. C, p. 3. The final policy covered Brasher Design from July 6, 2008 to July 6, 2009. Pl.'s Compl. ¶ 16. The relevant terms of the 2005–06 and the 2004–05 policies are essentially identical unless otherwise noted.

McDowell attached the 2004–05 and 2005–06 insurance agreements to its Complaint as Exhibits B and C. The first line of the 2004–05 Policy states that "THIS POLICY PROVIDES CLAIMS–MADE AND REPORTED COVERAGE." Pl.'s Compl. Ex. B at p. 5. Similarly, the 2004–05 Policy defines the terms of coverage accordingly:

> We will pay on behalf of the "Insured" all sums in excess of the Deductible noted in Item 6, of the Declarations that you are legally obligated to pay as "Damages" because of "Claims" first made against you during the "Policy Period" and reported to us during the "Policy Period,"

or the Extended "Claims" Reporting Period if applicable, provided that:

A. the "Claim" arises out of an actual or alleged negligent act, error or omission with respect to "Professional Services" rendered or that should have been rendered by you or any entity for whom you are legally responsible, including your interest in joint ventures;

B. the act, error, or omission took place during the "Policy Period" or on or after the "Retroactive Date" specified in the Declarations;

C. prior to the effective date of the first policy issued to you and continuously renewed by us, no principal, partner, director or officer of yours had knowledge of any circumstance that could reasonably be expected to result in a "Claim"; [1]

D. all "Claims" made against you are made during the "Policy Period"; and

E. you give prompt notice of a "Claim", but not later than 60 days after expiration or termination of this policy, in accordance with the Notice of Claims conditions of this policy.

Pl.'s Compl. Ex. B at p. 5. The term "Claim" is defined as "any demand received by you seeking 'Damages' or 'Professional Services' and alleging liability or responsibility on your part."Pl.'s Compl. Ex. B at p. 5. Finally, the section "Claim Provisions" provides that "[w]ritten notice must be provided to [Zurich] no later than 60 days after the expiration or termination of the policy."Pl.'s Compl. Ex. B at p. 8.

In early November, 2009, Brasher Design's attorneys first notified Zurich of the Zokaites Complaint. *Id.* ¶ 14.Zurich declined coverage by letter dated February 17, 2010. *Id.* ¶ 16.The stated reason for the denial was that the Zokaites Complaint had been filed before Brasher Design's most recent policy, which was effective July 6, 2008 to July 6, 2009. *Id.* McDowell alleges that Zurich was not prejudiced by Brasher Design's late notice. *Id.* ¶ 20.

**\*3** McDowell's case against MHT proceed to trial in September of 2010, and the state court found that Brasher Design had not in fact filed an application. *Id.* ¶ 21.Brasher Design renewed its request for coverage at this point, but Zurich again denied the claim. *Id.* ¶ 22.

On June 1, 2010, Brasher Design and McDowell settled the claims in the Zokaites Complaint. *Id.* ¶ 24.Under the terms of the settlement agreement, the parties agreed that McDowell's loss due to Brasher Design's failure to file the application was $625,000 plus interest at the legal rate from April 2, 2005. *Id.* ¶ 25.In addition, Brasher Design assigned all claims against Zurich to McDowell. *Id.* ¶ 26.

After the settlement between McDowell and Brasher Design, McDowell instituted suit asserting its subrogated rights against Zurich in the Circuit Court for Baltimore City, Maryland on August 1, 2012. Zurich was served on August 27, 2012, and it removed to this Court on September 26, 2012 based on diversity of citizenship under 28 U.S.C § 1332. McDowell's Complaint (ECF No. 2) contains two counts. The first count alleges a breach of contract claim premised upon a duty to indemnify, for which McDowell seeks "$625,000, plus interest at the legal rate from April 2, 2005, costs, and attorney's fees."*Id.* ¶ 30.The second count alleges a breach of contract claim premised on a duty to defend, for which McDowell seeks "an amount greater than $25,000, plus interest, expenses, and attorney's fees."*Id.* ¶ 35.On October 3, 2012, Zurich filed its Motion to Dismiss.

### *STANDARD OF REVIEW*

Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."FED. R. CIV. P 8(a)(2).Rule 12(b)(6) of the Federal Rules of Civil Procedure authorizes the dismissal of a complaint if it fails to state a claim upon which relief can be granted. The purpose of Rule 12(b)(6) is "to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses."*Presley v. City of Charlottesville,* 464 F.3d 480, 483 (4th Cir.2006).

The Supreme Court's recent opinions in *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), and *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), "require that complaints in civil actions be alleged with greater specificity than previously was required."*Walters v. McMahen,* 684 F.3d 435, 439 (4th Cir.2012) (citation omitted). The Supreme Court's decision in *Twombly* articulated "[t]wo working principles" that courts must employ when ruling on Rule 12(b)(6) motions to dismiss. *Iqbal,* 556 U.S. at 678. First, while a court must accept as true all the factual allegations contained in the

complaint, legal conclusions drawn from those facts are not afforded such deference. *Id.* (stating that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to plead a claim).

**\*4** Second, a complaint must be dismissed if it does not allege "a plausible claim for relief." *Id.* at 679.Under the plausibility standard, a complaint must contain "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action."*Twombly,* 550 U.S. at 555. Although the plausibility requirement does not impose a "probability requirement," *id.* at 556,"[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."*Iqbal,* 556 U.S. at 663;*see also Robertson v. Sea Pines Real Estate Cos.,* 679 F.3d 278, 291 (4th Cir.2012) ("A complaint need not make a case against a defendant or *forecast evidence* sufficient to *prove* an element of the claim. It need only *allege facts* sufficient to *state* elements of the claim."(emphasis in original) (internal quotation marks and citation omitted)). In short, a court must "draw on its judicial experience and common sense" to determine whether the pleader has stated a plausible claim for relief. *Iqbal,* 556 U.S. at 664.

### *ANALYSIS*

The issue before this Court is whether Section 19–110 of the Insurance Article of the Maryland Code applies in this case. In essence, § 19–110 provides that, if an insurer seeks to disclaim coverage based on failure to provide timely notice that is required under the terms of an insurance policy, the insurer must establish that the failure to provide notice caused actual prejudice to the insurer.[2]

In its Motion to Dismiss, Zurich argues that § 19–110 is inapplicable and that its denial of coverage was therefore proper and permissible. In Zurich's view, the timely notice requirement contained in Brasher Design's insurance policy was a condition precedent of coverage, and as such, § 19–110 was not triggered. In opposition, McDowell argues that § 19–110 prohibits insurance companies from characterizing timely notice provisions as conditions precedent to insurance coverage.

In support of their positions, both sides point to *Sherwood Brands, Inc. v. Great American Insurance Co.,* 418 Md. 300, 13 A.3d 1268 (2011)—the capstone of a series of cases from

the Court of Appeals of Maryland interpreting § 19–110. On the one hand, Zurich argues that this line of cases creates an exception for the type of insurance involved here and, therefore, that no showing of prejudice was required. On the other hand, McDowell argues that § 19–110 applies to all types of policies and that the few cases where the statute was not applied involved factual situations where the claim itself (and not just the notice) occurred after the policy period ended. In light of the history of § 19–110 and its interpretation by Maryland courts, as well as the factual circumstances of this particular case, this Court finds that § 19–110 must be applied to this policy.

### I. The History of § 19–110 and Subsequent Interpretation by the Court of Appeals of Maryland.

**\*5** Judge Bredar of this Court has recently reviewed the history of § 19–110 in in *Minnesota Lawyers Mut. Ins. Co. v. Baylor & Jackson, PLLC,* 852 F.Supp.2d 647, 658–62 (D.Md.2012). Perhaps the most detailed analysis, however, appears in the *Sherwood* case itself. *See*318 Md. at 310–24, 13 A.3d at 1274–83.Suffice it to say, § 19–110[3] was enacted to overturn *Watson v. United States Fidelity and Guaranty Co.,* 231 Md. 266, 189 A.2d 625 (1963), which held that timely notice could be characterized as a condition precedent for automobile insurance coverage under Maryland common law. *See Sherwood,* 318 Md. at 310–11, 13 A.3d at 11274–75.As several commentators have pointed out, the statute prevents the forfeiture that occurs when an individual pays for an insurance policy but is denied coverage on procedural grounds. *See id.* at 312, 418 Md. 300, 13 A.3d at 1275 (quoting *A Legal Process Analysis for a Statutory and Contractual Construction of Notice and Proof of Loss Insurance Disclaimers,* 38 MD. L.REV. 299, 309–10 (1978)); *id.* at 314, 13 A.3d at 1277 (quoting *St. Paul Fire & Marine Ins. Co. v. House,* 315 Md. 328, 345, 544 A.2d 404, 413 (1989) (Murphy, C.J., dissenting)). Meanwhile, the prejudice requirement helps to balance the interests of both insurers and insureds. While insurance carriers may be harmed when they are denied an opportunity to make an adequate investigation or put on an effective defense, the statute requires the carrier to demonstrate that such harm actually occurred before untimely notice may be invoked as the reason for denial.[4] Thus, the statute assures that the notice provisions of insurance policies are enforced in only those cases for which the notice provisions were drafted—i.e., where the insured's failure to provide notice has undercut the carrier's opportunity to limit its liability. *See id.* at 314–15, 554 A.2d 404, 418 Md. 300, 13 A.3d at 1277.

The application of § 19–110 became more difficult with the rise of claims-made insurance policies. Claims-made policies provide insurance coverage for claims made against the insured during the policy period (rather than for a specific event that occurs during that time).[5] These types of policies are particularly common for professional malpractice insurance, as they provide effective coverage in situations where the negligent act was difficult to pinpoint, latent, or occurred over an extended period of time. *See id.* at 316, 13 A.3d at 1277–78. A modified version of the claims-made policy is the "claims-made and reported" policy. Under this type of policy, the claim made to the insurer by the insured is the event triggering coverage. *See id.* at 317, 13 A.3d at 1278.

#### A. *T.H.E. Insurance Co. v. P.T.P., Inc.*

The Court of Appeals first explored the limits of § 19–110 in *T .H.E. Insurance Co. v. P.T.P., Inc.,* 331 Md. 406, 628 A.2d 223 (1993). There, P.T.P. had purchased a claims-made insurance policy from T.H.E. Insurance Co. ("T.H.E.") for the period between April 2, 1987 and April 2, 1988 for its "go-kart track" business. *Id.* at 412, 628 A.2d at 225–26. The policy required written notice of a claim "as soon as practicable" and provided a 60–day extended reporting period. *Id.* at 412, 628 A.2d at 225–26. Under the terms of the policy, a claim was made when written notice of the claim was received and recorded by T.H.E. *Id.* at 411–12, 628 A.2d at 225.

**\*6** On August 27, 1987—during the duration of the policy—one of P.T .P.'s customers was injured. *Id.* at 408, 628 A.2d at 224. A claim for damages, however, was not made until June 6, 1988—more than 60 days after the policy expired.[6] *Id.,* 628 A.2d at 224. Accordingly, T.H.E. denied P.T.P.'s claim on the policy. *Id .* at 409, 628 A.2d at 224.

The Court of Appeals ruled that T.H.E.'s denial was proper, finding that the policy had expired before any claim was made. *Id .* at 415, 628 A.2d at 227. Because the making of a claim was a condition precedent for coverage, the Court of Appeals refused to apply § 19–110's requirement for a showing of prejudice. *Sherwood,* 418 Md. at 332, 13 A.3d at 1288 (explaining the Court of Appeal's conclusion in *T.H.E.*). As the Court of Appeals noted, the purpose of statute was to protect against denials of coverage based upon the insured's failure to comply with the agreement's notice terms where that failure had not prejudiced the insurer. *See T.H.E.,* 331 Md. at 421, 628 A.2d at 230. Thus, the Court of Appeals found that the statute did not apply in *T.H.E .:*

> Here, T.H.E. does not deny coverage because of an alleged material failure by P.T.P. to perform a covenant to give notice, or to satisfy a policy provision that might be phrased as a condition that must be satisfied to prevent the loss of coverage that otherwise would apply. In this case the extended reporting period under the original policy had expired before P.T.P. reported the Buckley claim to T.H.E. The original policy had come to an end with respect to newly reported claims. [Section 19–110] could no more revive the original policy to cover the Buckley claim than [§ 19–110] could reopen an occurrence policy to embrace a claim based on an accident that happened after the end of the policy period.

*Id.* at 415, 628 A.2d at 228. Because the particular interests protected by the statute were not implicated, T.H.E. was not required to provide a showing of prejudice prior to their denial of the claim.

#### B. *Sherwood Brands, Inc. v. Great American Insurance Co.*

The Court of Appeals clarified the application of § 19–110 to claims-made policies in *Sherwood Brands, Inc. v. Great American Insurance Co.* There, Great American Insurance Co. ("Great American") supplied Sherwood Brands with an employment practices liability insurance policy effective May 1, 2007 to May 1, 2008. The definition of a claim included civil proceedings instituted against Sherwood Brands by service of a complaint, but the policy also stated that written notice within 90 days of the end of the policy period was a "condition precedent" of coverage. *See id.* at 304–05, 13 A.3d at 1271. Subsequently, two separate suits were initiated against Sherwood Brands during the policy period. *Id.* at 305, 13 A.3d at 1271. Notice, however, was not provided to Great American until October 27, 2008–more than 90 days after the end of the policy. *Id.* at 305–06, 13 A.3d at 1271–72.

2013 WL 5234250

**\*7** The Court of Appeals began its analysis of the case by carefully circumscribing its holding in *T.H.E.* In particular, the Court of Appeals indicated that it intended to carefully review the issues before it:

> It would be simple—if not lazy—for us to conclude that *T.H.E* . held that § 19–110 does not apply to claims-made policies, pronounce the Policy a claims-made policy, and move on to the next case. We decline to follow that path. *T.H.E.* is not dispositive wholly of the present case. Further, it would be simple to focus on the portion of the Policy requiring Sherwood to give notice "as soon as practicable, but in no event later than ninety (90) days after the end of the Policy Period," declare the Policy a "claims-made-and-reported" policy, and jump on the bandwagon of other jurisdictions that decline uniformly to extend notice-prejudice rules to claims-made-and-reported policies. But no, we shall take the path less traveled. Our emphasis should not be on other jurisdictions' treatment of claims-made and claims-made-and-reported policies vis à vis their respective notice-prejudice rules because most of those cases did not confront or construe a statute like Maryland's. Thus, our emphasis must be on the text of, and policies underlying, § 19–110.

*Id.* at 326, 418 Md. 300, 13 A.3d at 1284. Noting that the terms of the insurance agreement expressly labeled timely notice as a condition precedent of coverage, the Court of Appeals nevertheless found that the notice provisions must be treated as covenants and that § 19–110 applied. *Id.* at 331, 13 A.3d at 1287 ("[Section 19–110] was enacted effectively to overrule *Watson,* discard the strict condition-precedent approach, and "make[ ] policy provisions requiring notice to, and cooperation with, the insurer *covenants and not conditions.*"(quoting *Sherwood Brands, Inc. v. Hartford Acc. and Indem. Co.,* 347 Md. 32, 42, 698 A.2d 1078, 1082 (Md.1997))).

Ultimately, the Court of Appeals summarized the basic rule to be applied in future cases as follows:

> We hold that § 19–110 does not apply, as was the case in T.H.E., to claims-made policies in which the act triggering coverage—usually notice of a claim or suit being filed against and served upon an insured under third-party liability policies—does not occur until after the expiration of the liability policy, as this non-occurrence of the

> condition precedent to coverage is not a "breach of the policy," as required by the statute. On the other hand, we hold that § 19–110 does apply, as is the case at present, to claims-made policies in which the act triggering coverage occurs during the policy period, but the insured does not comply strictly with the policy's notice provisions. In the latter situation, § 19–110 mandates that notice provisions be treated as covenants, such that failure to abide by them constitutes a breach of the policy sufficient for the statute to require the disclaiming insurer to prove prejudice.

**\*8** *Id.* at 333, 418 Md. 300, 13 A.3d at 1288. Moreover, the Court of Appeals clarified that "[n]otice provisions, *even in claims-made-and-reporting policies,* must be deemed covenants such that failure to abide by them constitutes a breach of the policy sufficient to make § 19–110 applicable to such policies."*Id.* at 327 n. 21, 13 A.3d at 1285 n. 21 (emphasis added).

## II. Application of § 19–110 Jurisprudence to This Case
This Court recognizes that Judge Bredar and Judge Grimm of this Court have recently ruled that § 19–110 was inapplicable to insurance scenarios arguably similar to the one involved in this case. *See Minnesota Lawyers Mut. Ins. Co. v. Baylor & Jackson, PLLC,* 852 F.Supp.2d 647 (D.Md.2012); *Financial Industry Regulatory Authority, Inc. v. Axis Ins. Co.,* No. PWG–12–1053, 2013 U.S. Dist. LEXIS 82343, 2013 WL 2946950 (D.Md. June 12, 2013). However, both of those cases were decided on summary judgment rather than motions to dismiss. In this case, Zurich has moved to dismiss the complaint under Rule 12(b)(6), contending that it fails to state a claim.

In addition, this Court finds the state of § 19–110 jurisprudence in the Fourth Circuit is still very much in flux [7] and that further development of the record would better enable this Court to determine the ultimate applicability of § 19–110. Under Maryland law, the characterization of the policy as a claims-made and reported policy in the insurance agreement is not controlling. *See Sherwood,* 418 Md. at 327 n. 21, 13 A.3d at 1285 n. 21 ("Notice provisions, *even in claims-made-and-reporting policies,* must be deemed covenants such that failure to abide by them constitutes a breach of the policy sufficient to make § 19–110 applicable

to such policies."(emphasis added)); *see also id.* at 327 n. 22, 13 A.3d at 1284 n. 22 ("*T.H.E.* does not stand for the proposition that the statute does not apply to a 'claims made plus reporting' policy' "). Rather, the facts of this case and the provisions of the agreement must be scrutinized to determine the applicability of § 19–110.

On its face, McDowell's Complaint contains sufficient allegations to trigger the application of § 19–110. Brasher Design first learned that MHT did not have the tax credit application on September 23, 2004, but a formal claim— the Zokaites Complaint—was not filed until June 27, 2006. Pl.'s Compl. ¶¶ 9, 11. At that time, the 2005–06 Policy was in effect, and that policy contained a retroactive date before September 23, 2004. Pl.'s Compl. ¶ 14; Ex. C p. 3. Notice of the Zokaites Complaint, however, was not provided to Zurich until November 2009—several years after the 60–day notice period provided for in the 2005–06 Policy terms provided. Pl.'s Compl. ¶ 14. Thus, McDowell has alleged that a policy was in place; that a trigger event (the Zokaites Complaint) occurred during the policy period; and that coverage was denied based upon a failure to provide timely notice. Therefore, because an insurance policy was in place and effective when the claim against the insured was first made, the factual circumstances of this case make it similar to *Sherwood* and different from *T.H.E.*

 **\*9**  In addition, the notice requirements contained in the 2005–06 Policy are likely covenants under Maryland law. *See Sherwood,* 418 Md. at 331, 13 A.3d at 1287 ("[Section 19–110] was enacted effectively to ... discard the strict condition-precedent approach, and "make[ ] policy provisions requiring notice to, and cooperation with, the insurer *covenants and not conditions."*(quoting *Sherwood Brands, Inc. v. Hartford Acc. and Indem. Co.,* 347 Md. 32, 42, 698 A.2d 1078, 1082 (Md.1997))). The 2005–06 Policy defines a "Claim" as "any demand received by you, seeking 'Damages' or 'Professional Services' and alleging liability or responsibility on your part."Pl.'s Compl. Ex. B at 5, Ex. C. at 5. Thus, the most basic definition of the policy suggests that the triggering event is the assertion of a claim against the Brasher Design, not the reporting to the Zurich of third party's claim.

Moreover, several of the provisions of the policy invoke language of contingency. With respect to the coverage of the policy, the 2005–05 Policy states that Zurich will pay for " 'Claims' first made against [Brasher Design] and reported to us during the 'Policy Period'...*provided that*... [Brasher Design] give[s] prompt notice of a 'Claim', but not later

than 60 days after expiration or termination of this policy, in accordance with the Notice of Claims conditions of this policy."*Id.* (emphasis added). Similarly, the Notice of Claims condition contained in the "Claim Provisions" section contains similar language, stating that "[w]ritten notice must be *provided* to [Zurich] no later than 60 days after the expiration or termination of the policy."Pl.'s Compl. Ex. B at p. 8, 698 A.2d 1078 (emphasis added). The term "provided" in both of these clauses suggests that coverage was intended to be a condition or contingency for coverage. As the Court of Appeals of Maryland made clear in *Sherwood,* however, such language in notice provisions must be treated as a covenant rather than a condition precedent under Maryland law. *See Sherwood,* 418 Md. at 331, 13 A.3d at 1287 ("[Section 19– 110] was enacted effectively to ... discard the strict condition-precedent approach, and "make[ ] policy provisions requiring notice to, and cooperation with, the insurer *covenants and not conditions."*(quoting *Sherwood Brands, Inc. v. Hartford Acc. and Indem. Co.,* 347 Md. 32, 42, 698 A.2d 1078, 1082 (Md.1997))); *see id.* at 331, 418 Md. 300, 13 A.3d at 1287 ("Therefore, notwithstanding that Great America labeled the notice provisions in the Policy as conditions precedent to coverage, § 19–110 mandates that the notice provisions of the Policy be treated as covenants, not conditions.").

If the notice terms of the insurance agreement are covenants, Brasher Design's failure to provide timely notice is a breach of the agreement. Thus, McDowell's allegation that Zurich denied coverage based upon Brasher Design's breach of the covenant to provide timely notice would trigger the application of § 19–110 and the requirement for a showing of prejudice. *See*§ 19–110 (requiring a showing of actual prejudice where coverage is disclaimed based upon a breach of the policy "by not giving the insurer required notice"). Therefore, McDowell's Complaint is sufficient to assert a claim entitling it to relief.

### CONCLUSION

 **\*10**  For the reasons stated above, Defendant Zurich American Insurance Co.'s Motion to Dismiss (ECF No. 6) is DENIED.

A separate Order follows.

### ORDER

For the reasons stated in the foregoing Memorandum Opinion, it is this 17th day of September, 2013, ORDERED that:

1. Defendant Zurich American Insurance Co.'s Motion to Dismiss (ECF No. 6) is DENIED; and

2. The Clerk of the Court transmit copies of this Order and accompanying Memorandum Opinion to Counsel.

Footnotes

1    The 2005–06 Policy replaces this subdivision with: "prior to the effective date of this policy you or any 'Insured' had no knowledge of any 'claim' or circumstances, involving an act, error, or omission, which may result in a 'claim' under this policy."Pl.'s Compl. Ex. C at p. 16.

2    The full text of § 19–110 reads:

An insurer may disclaim coverage on a liability insurance policy on the ground that the insured or a person claiming the benefits of the policy through the insured has breached the policy by failing to cooperate with the insurer or by not giving the insurer required notice only if the insurer establishes by a preponderance of the evidence that the lack of cooperation or notice has resulted in actual prejudice to the insurer.

Md.Code, Ins. § 19–110.

3    For ease of reference, the Court refers to the enactment as § 19–110 both here and throughout this opinion. In reality, the original statute was enacted under Article 48A, § 482 of the former Maryland Code and applied only to automobile policies. *Sherwood,* 418 Md. at 311, 13 A.3d at 1275. In 1966, the statute was extended to any liability policy.*Id.* at 311 n. 10; 13 A.3d at 1275 n. 10. The statute was recodified in its current location in 1996. *Id.* at 322, 13 A.3d at 1281. While the wording of old § 482 and § 19–110 is slightly different, the Court of Appeals of Maryland has recognized them as substantively the same. *See id.* at 322, 13 A.3d at 1282.

4    The term "actual" was inserted into § 19–110 in a 1997 amendment. *See Sherwood,* 418 Md. at 322 n. 17, 13 A.3d at 1281 n. 17.

5    Thus, claims-made policies are different from the traditional "occurrence" policies, which cover specific events and occurrences for a fixed time period. Under an occurrence policy, an insurer's obligations do not expire with the fixed time period of the policy; instead, the insurer "may be held liable for the covered events, barring statutes of limitations, at any time thereafter."*Sherwood,* 418 Md. at 318, 13 A.3d at 1279 (quoting *House,* 315 Md. at 356, 554 A.2d at 418).

6    While P.T.P. had renewed its insurance, the new policy did not apply to the particular claim at issue. Specifically, the renewed policy ran from May 27, 1988 to May 27, 1989. The retroactive date for this new policy, however, was Mary 27, 1988, which meant that claims that arose from events occurring before May 27, 1988 were not covered by the policy. Thus, the accident on August 2, 1987 was not covered.

7    The Fourth Circuit has yet to issue a definitive opinion addressing § 19–110 after the *Sherwood* case. Indeed, on appeal in *Baylor & Jackson,* at least one Judge of the U.S. Court of Appeals for the Fourth Circuit expressly rejected the district court's conclusion. *See Minnesota Lawyers Mut. Ins. Co. v. Baylor & Jackson,* No. 12–1581, 2013 U.S.App. LEXIS 13235, at *35–*36, 2013 WL 3215246 (4th Cir. June 27, 2013) (unpublished) (Thacker, J., dissenting). Two other judges of the panel avoided the issue by simply finding that, even if § 19–110 applied, the insurance company had adequately shown actual prejudice. *Id.* at *20–*21 ("The district court concluded that section 19–110 is inapplicable to the policy MLM provided to Baylor & Jackson, but we decline to reach the issue.").

In his opinion in *Axis Insurance Co.,* Judge Grimm quoted at length a section from *Sherwood* that summarized the development of notice-prejudice law after *T.H.E.* The passage reads:

Nationwide, courts' holdings regarding the applicability of notice-prejudice rules to claims-made-and-reported policies have been uniform; "[i]n those jurisdictions that have examined the distinction between claims-made and claims-made-and-reported policies, the courts have uniformly relieved the insurers from any requirement to prove prejudice under the latter form of coverage." 3 *New Appleman on Insurance,* supra § 20.01[7][b]. Applying Maryland law, the federal Fourth Circuit Court of Appeals and the United States District Court for the District of Maryland—relying on *T.H.E.* [*Ins. Co. v. P.T.P. Inc.,* 628 A.2d 223, 223, 331 Md. 406 (Md.1993) ]—held that **§ 19–110's provisions do not apply to claims-made-and-report[ed] policies.***See Janjer Enters., Inc. v. Executive Risk Indem., Inc.,* 97 Fed. Appx. 410, 414 (4th Cir.2004) ( "Maryland courts have held that 'claims made and report[ed]' policies ... are not subject to its prejudice requirement."); *Maynard v. Westport Ins. Corp.,* 208 F.Supp.2d 568, 574 (D.Md.2002) (quoting *The Rouse Co. v. Fed. Ins. Co.,* 991 F.Supp. 460, 465 (D.Md.1998)) ("Section 19–110, however, only applies to true 'claims made' policies. 'Under Maryland law, the "actual prejudice" requirement of § 19–110 does not apply to a "claims made plus report[ed]" policy....' ").

*Axis Ins. Co.,* 2013 U.S. Dist. LEXIS 82343 at \*30–\*31 (quoting *Sherwood,* 418 Md. at 324, 13 A.3d at 1282–83). However, upon further review, this Court notes that *Sherwood* explicitly states that § 19–110 applies to claims-made and reported policies. *See* 418 Md. 326–27, n. 21 & 22, 13 A.3d at 1284 n. 21 & 22. Moreover, later in the *Sherwood* opinion, the Court of Appeals of Maryland disavowed portions of the quoted passage. *See id.* at 418 Md. 326 n. 21, 13 A.3d at 1284 n. 21 ("[W]e disavow ourselves of language in *Janger, Maynard,* and *Rouse* suggesting that *T.H.E.* be read to stand for the proposition that § 19–110 does not apply to all 'claims-made-and-reporting policies.' ").

---

**End of Document**                                   © 2014 Thomson Reuters. No claim to original U.S. Government Works.

Appeal: 14-1924      Doc: 19      Filed: 11/19/2014      Pg: 45 of 59

Navigators Specialty Ins. Co. v. Medical Benefits Adm'rs of..., Not Reported in...

2014 WL 768822

2014 WL 768822
Only the Westlaw citation is currently available.
United States District Court,
D. Maryland.

NAVIGATORS SPECIALTY
INSURANCE CO., Plaintiff,
v.
MEDICAL BENEFITS ADMINISTRATORS
OF MD, INC., et al., Defendants.

Civil Action No. ELH–12–2076.    |    Feb. 21, 2014.

### MEMORANDUM OPINION

ELLEN LIPTON HOLLANDER, District Judge.

**\*1** This case involves an insurance coverage dispute between plaintiff Navigators Specialty Insurance Co. ("Navigators") and defendants Medical Benefits Administrators of MD, Inc. ("MBA") and R.J. Wilson & Associates, Ltd. ("RJW"). The dispute arises from two successive Error and Omissions insurance policies (the "2009–2010 Policy" and the "2010–2011 Policy") issued by Navigators to MBA, each of which contained an endorsement naming RJW as an additional insured.

In sum, Navigators filed suit in this Court (ECF 1) seeking a declaration that it is not required to provide coverage to defendants under the 2010–2011 Policy with respect to a lawsuit pending in this district against defendants, *Certain Underwriters at Lloyd's London v. R.J. Wilson and Associates, Ltd. and Medical Benefits Administrators of Md. Inc.,* Civ. No. CBB–11–01809, filed on June 30, 2011 (the "Maryland Action"). [1] That suit involves claims for breach of contract, breach of fiduciary duty, and fraud and seeks more than one million dollars in damages. Navigators contends, *inter alia,* that the insured did not timely make and report the claim to Navigators. According to Navigators, the claim was reported during the 2010–2011 policy period, but it was first made against the defendants as early as 2008 and, at the latest, by July 26, 2010. Therefore, Navigators maintains that no coverage is available under the 2010–2011 Policy. ECF 47–1 at 10, 12. Navigators, which has been defending MBA and RJW in the Maryland Action subject to a reservation of rights and defenses, also claims that it is entitled to reimbursement for the expenses it has incurred in defending MBA and RJW in the Maryland Action. [2]

Defendants filed a counterclaim (ECF 22) seeking a declaration that coverage for the Maryland Action exists under the 2010–2011 Policy or, alternatively, that coverage exists under the 2009–2010 Policy. As to the 2010–2011 Policy, they maintain that the claim was first made against them and reported to Navigators within the policy period. Alternatively, they argue that if the claim was first made against them before the 2010–2011 policy period, then the claim is covered under the 2009–2010 Policy. They acknowledge that they did not timely report the claim to Navigators within the 2009–2010 policy period, but contend that Navigators was not prejudiced by late notice.

The parties have filed cross-motions for summary judgment. Navigators filed a Motion for Summary Judgment ("Navigators Motion," ECF 47), supported by a memorandum of law ("Memo," ECF 47–1) and several exhibits. Defendants filed a consolidated Opposition and Cross–Motion for Summary Judgment (ECF 48), also supported by a memorandum of law ("Opp.," ECF 48–1) and several exhibits. [3] The central issue is whether Navigators is required by either policy to provide coverage to MBA and RJW with respect to the Maryland Action.

No hearing is necessary to resolve the motions. *See* Local Rule 105.6. For the reasons set forth below, I will grant plaintiff's motion with regard to the 2010–2011 Policy, and will deny it with regard the 2009–2010 Policy. And, I will deny defendants' cross-motion.

### Factual Summary

#### *The Navigators Policies*

**\*2** This case involves two successive claims-made-and-reported insurance policies issued by Navigators to MBA. [4] The first policy, number NY09MPL669102NC, was issued for the period October 31, 2009 to October 31, 2010 ("2009–2010 Policy," Ex. P to Park Dec., ECF 47–19). [5] The second policy, number NY10MPL669102IC, was issued for the period October 31, 2010 to October 31, 2011 ("2010–2011 Policy," Ex. Q to Park Dec., ECF 47–20).

Section I.A. of each policy provides, *e.g.,* 2009–2010 Policy (defined terms bolded in original):

Appeal: 14-1924     Doc: 19     Filed: 11/19/2014     Pg: 46 of 59

Navigators Specialty Ins. Co. v. Medical Benefits Adm'rs of..., Not Reported in...

2014 WL 768822

[Navigators] will pay on behalf of the **Insured** all sums in excess of the deductible [$25,000] that the **Insured** becomes legally obligated to pay as **damages** and **claim expenses** as a result of a **claim** first made against the **Insured** and reported in writing to [Navigators] during the **policy period**... by reason of an act or omission ... in the performance of **professional services** by the **Insured** or by someone for whom the **Insured** is legally responsible, provided that:

1. Such act or omission was committed on or subsequent to the **retroactive date** specified in Item 8 in the Declarations; and

2. Prior to the inception date of this policy and if continuously renewed, no **Insured** had a basis to believe that any such act or omission, or related act or omission, might reasonably be expected to be the basis of a **claim**.

In the 2009–2010 Policy, the term "claim" is defined as "a demand for money or services naming the **Insured** arising out of an act or omission in the performance of **professional services.** A **claim** also includes the service of suit or the institution of an arbitration proceeding against the **Insured.**" 2009–2010 Policy at 5 (defined terms bolded in original). In the 2010–2011 Policy, the term "claim" is defined as follows: "A demand received by an **Insured** for money or services, the service of suit against an **Insured,** or the institution of arbitration against an **Insured.**" 2010–2011 Policy at 19 (defined terms bolded in original).

Both policies also contain an Additional Insured Endorsement. It provides: "In consideration of the premium charged, it is understood and agreed that the persons or entities named below shall be added as additional Insureds under this policy, but only as respects their liability for an Insured's acts or omissions." Ex. P to Park Dec., Endorsement ("Endt.") 2; Ex. Q to Park Dec., Endt. 1.

On or about October 19, 2010, MBA's representative signed an Errors and Omissions Insurance Renewal Application ("2010 Application"). Ex. R. to Park Dec. The 2010 Application provided, in part, *id.:*

> The Applicant's Failure to report to the Company any Claim made against it during the current policy term, or act, or omission or circumstances which the Applicant is aware of which

may give rise to a Claim before the expiration of the current policy may create a lack of coverage for each Applicant who had a basis to believe that any such act, error, omission, or circumstance might reasonably be expected to be the basis of a claim.

**\*3** Similarly, Section I of the 2010–2011 Policy, entitled "Insuring Agreements," provided that coverage was only available if if "[p]rior to the inception date of [the 2010–2011 ] policy and if continuously renewed no **Insured** had a basis to believe that any such act or omission, or related act or omission, might reasonably be expected to be the basis of a **claim.**"(Ex. Q to Park Dec., Endt. 4).

### The Maryland Action

In late 2004 or early 2005, RJW entered into a Coverholder Agreement, referred to as the "Client First Binding Authority Agreement," with Brit Insurance ("Brit"), [6] an underwriter at Lloyd's of London (collectively, "Lloyd's"). Declaration of Ronald J. Wilson, CEO of RJW and MBA ("Wilson Dec.," ECF 48–4) ¶ 3. The Coverholder Agreement authorized RJA to act on behalf of Lloyd's to bind and administer Certificates of Insurance ("Certificates"), providing aggregate and specific excess-loss coverage to employer self-funded benefit plans. *Id.* ¶ 4. [7] This program was referred to as the "Client First Program." *Id.* The Coverholder Agreement provided that MBA would act as claims administrator for the Certificates. *Id.*

All Certificates issued under the Client First Program included a Monthly Aggregate Accommodation Agreement ("MAA").*Id.* ¶ 5. The MAA required the insurer to provide advances on a cumulative monthly basis to the insured if the insured was on pace to meet its annual deductible. *Id.* For example, if after five months of the contract, the insured filed claims for greater than five-twelfths of its annual deductible, the insurer would provide advances to the insured. *Id.* At the end of the contract year, the insured was required to reimburse Lloyd's for the amount of advances it received in excess of what was required under the final annual aggregate. *Id.*

RJW and Lloyd's agreed that MBA would act as RJW's Claims Administrator in regard to the Certificates of Insurance issued under the Client First Binding Authority

Appeal: 14-1924    Doc: 19    Filed: 11/19/2014    Pg: 47 of 59

Navigators Specialty Ins. Co. v. Medical Benefits Adm'rs of..., Not Reported in...

2014 WL 768822

Agreement. Wilson Dec. ¶ 4. Pursuant to that agreement, RJW submitted reports, called bordereaux, to the Lloyd's broker detailing premiums, claims, advances received and paid to the individual employer welfare plans, and other pertinent accounting information on a monthly basis. *Id.* ¶ 9. MBA, as RJW's Claims Administrator, processed all the claims and accumulated and prepared all of the information for the reports. *Id.* ¶ 10.The Lloyd's broker reviewed the bordereaux and balanced the accounts with Lloyd's at the Exchange Office each month. *Id.* ¶ 11.

On May 10, 2007, Lloyd's terminated the Client First Program. *Id.* ¶ 6. The Certificates issued under the Program expired one year from the date that notice of termination was provided to the insureds. *Id.* At the end of the period of insurance and settlement of all claims, Lloyd's had the right to review and audit RJW's records to make a final accounting and determine if either Lloyd's or RJW was owed money. *Id.* ¶ 7. Lloyd's conducted an initial review and came to the conclusion that over one million dollars in accommodation advances had never been repaid to Lloyd's. *See* Complaint in Maryland Action, ECF 1–1 ¶ 30. In 2008, Lloyd's asked Northshore International Insurance Services, Inc. ("NIIS") to audit the pertinent documents and identify the accommodation advances that were not repaid in accordance with the MAA. Wilson Dec. ¶ 12. In June of 2009, N I IS concluded that $1,032,371.69 in advancements had not been repaid or otherwise reconciled. *See id.* ¶ 15.

**\*4** On multiple occasions, Lloyd's and/or its agents corresponded with MBA and/or RJW about the discrepancy. Notably, in June 2009, David Ives, CEO of NIIS, stated in an email to Ronald Wilson that "there remains more than $1 million in aggregate advances that have not been supported or reconciled by our office. Until that occurs, those funds are credits due [Lloyd's]."*See* Ex. H to Park Dec. at 10 ("June 2009 Email"). [8] On June 24, 2009, Ives sent a letter to Ronald Wilson in which he indicated that "the amount of $1,032,271.69 in advancements have not been repaid or otherwise reconciled to claim expenses."*Id.* at 13 ("June 2009 Letter"). The letter continued, *id.:*"[I]f additional claims have been received that may be subject to Lloyd's Certificates, please provide the details and supporting documentation. We await the product of your reconciliation, as well."

On January 29, 2010, Matthew Wilson, the CEO of Brit, wrote to Ronald W ilson. [9] In his letter, he stated, Ex. I to Park Dec., ECF 47–12 ("January 2010 Letter") (emphasis added):

Information developed over the past eighteen months clearly indicates that R.J. Wilson & Associates has failed to repay a portion of amounts paid by Certain Underwriters at Lloyd's which have been determined to be paid outside Agreement Numbers L4717 and WTB–OOlG–06W.

Specifically, you or your agents have failed to properly maintain records and account for Aggregate Accommodations amounts, which results in noncredited Aggregate Accommodation amounts outstanding and due of $3,178.65 in respect to the 2005 Treaty Year and $1,032,271.69 in respect to the 2006 Treaty year.

...

As a result of errors and omissions by R.J. Wilson & Associates, *a demand is hereby made* for the $1,113,811.66 in Specific and Aggregate amounts paid which have been determined to be paid outside Agreement Numbers L4717 and WTB–001 G–06W.

*If you have Professional Liability coverage that would respond to these claims, we strongly urge you to notify your insurer immediately.*Perhaps we can resolve this claim without the necessity of litigation which we are fully prepared to commence. Your actions and inactions have left us no other alternative.

By letter to RJW dated May 3, 2010, Brit referenced its prior "demand for repayment of $1,113,811.66 in claim funds due [Lloyd's]" and rejected a proposal RJW had previously made (ECF 47–13) to resolve their differences through the use of independent auditing firms. Ex. K to Park Dec., ECF 47–14 ("May 2010 Letter"). By letter of July 26, 2010, Ian Ritchie, a Senior Claims Adjuster at Brit, wrote to Brit's broker, Gavin Richards, [10] and stated: "If Mr. Wilson cannot provide the above information, [Lloyd's] will have no recourse but to proceed with litigation to collect the funds owed to [Lloyd's]." Ex. M to Park Dec., ECF 47–16 ("July 2010 Letter"). According to plaintiff, the letter was forwarded to Ronald Wilson. Park Dec. ¶ 43. [11]

**\*5** On June 30, 2011, Lloyd's filed suit in this Court against MBA and RJW, captioned *Certain Underwriters at Lloyd's London v. R.J. Wilson and Associates, Ltd. and Medical Benefits Administrators of Md. Inc.,* Civ. No. CBB–11–01809.On or about July 25, 2011, MBA and RJW notified Navigators about the suit. *See* RJW Response to Request for Admission, Ex. O to Park Dec. (ECF 47–18) at 2.

Appeal: 14-1924    Doc: 19    Filed: 11/19/2014    Pg: 48 of 59

Navigators Specialty Ins. Co. v. Medical Benefits Adm'rs of..., Not Reported in...

2014 WL 768822

As noted, Navigators has provided both RJW and MBA with defense counsel in the Maryland Action, subject to Navigators' reservation of rights and defenses. Declaration of Samuel Marcus, Senior Claims Counsel for Navigators ("Marcus Dec.," ECF 47–2) ¶ 2.

## Standard of Review

Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure. It provides, in part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law."Fed.R.Civ.P. 56(a); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322–24 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law."*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

In response to a motion for summary judgment, the non-moving party must demonstrate that there are disputes of material fact so as to preclude the award of summary judgment as a matter of law. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."*Anderson,* 477 U.S. at 247–48 (emphasis in original).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [its] pleadings,' but rather must 'set forth specific facts' " showing that there is a triable issue. *Bouchat v. Balt. Ravens Football Club, Inc.,* 346 F.3d 514, 522 (4th Cir.2003) (quoting former Fed.R.Civ.P. 56(e)), *cert. denied,*541 U.S. 1042 (2004). In resolving a summary judgment motion, the court must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co.,* 475 U.S. at 587;*see also FDIC v. Cashion,* 720 F.3d 169, 173 (4th Ci r.2013); *Dennis v. Columbia Colleton Med. Ctr., Inc.,* 290 F.3d 639, 645 (4th Cir.2002). The "judge's function" in reviewing a motion for summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby,* 477 U.S. at 249. If "the evidence is

such that a reasonable jury could return a verdict for the nonmoving party," there is a dispute of material fact that precludes summary judgment. *Id.* at 248.

**\*6** When, as here, the parties have filed cross-motions for summary judgment, the court must consider "each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.' " *Rossignol v. Voorhaar,* 316 F.3d 516, 523 (4th Cir.) (citation omitted), *cert. denied,*540 U .S. 822 (2003). "Both motions must be denied if the court finds that there is a genuine issue of material fact. But if there is no genuine issue and one or the other party is entitled to prevail as a matter of law, the court will render judgment." 10A Wright, Miller & Kane, Federal Practice & Procedure § 2720, at 336–37 (3d ed.1998, 2012 Supp.).

## Discussion

In the federal courts, declaratory judgments are authorized by the federal Declaratory Judgment Act, 28 U.S.C. § 2201(a), which provides (with exceptions not relevant here) that, in "a case of actual controversy within its jurisdiction, ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration."Because the parties' rights and obligations in this case arise under the policies, resolution of the cross motions for declaratory judgment turns on interpretation of those policies.

### *The 2010–2011 Policy*

The parties have filed cross motions for summary judgment on the question of whether the Maryland Action is covered under the 2010–2011 Policy. As discussed, the 2010–2011 Policy is a "Claims Made and Reported" policy, under which coverage is available only for "claims" that are first made against the insured *and* reported to the insurer within the policy period of October 31, 2010 to October 31, 2011. *See* 2010–2011 Policy at 1. Navigators concedes that defendants reported the Maryland Action to them within the policy period for the 2010–2011 Policy. Memo at 10. However, Navigators contends that the "claim" that gave rise to the Maryland Action was first made against defendants prior to October 31, 2010, and therefore the policy "has not been triggered and no coverage is available...."*Id.* at 12.Specifically, Navigators maintains that the June 2009 Email, the June 2009 Letter, the

Appeal: 14-1924    Doc: 19    Filed: 11/19/2014    Pg: 49 of 59

Navigators Specialty Ins. Co. v. Medical Benefits Adm'rs of..., Not Reported in...

2014 WL 768822

January 2010 Letter, the May 2010 Letter, and the July 2010 Letter each constituted "claims" under the policy. In response, defendants argue that no "claim" was made against them until they were named as defendants in the Maryland Action in July 2011, which fell within the policy period. Opp. at 7.

Thus, the dispute in Count I focuses on whether any of the communications between Lloyd's and defendants prior to the institution of the Maryland Action constituted "claims" within the meaning of the 2010–2011 Policy. If so, Navigators maintains that it has no obligation to provide coverage under the 2010–2011 Policy.

Maryland law is well settled that "the interpretation of an insurance policy is governed by the same principles generally applicable to the construction of other contracts." [12] *Mitchell v. AARP,* 140 Md. A pp. 102, 116, 779 A.2d 1061, 1069 (2001); *see State Farm Mut. Ins. Co. v. DeHaan,* 393 Md. 163, 193, 900 A.2d 208, 225–26 (2006); *Cole v. State Farm Mut. Ins. Co.,* 359 Md. 298, 305, 753 A.2d 533, 537 (2000); *see also Cornerstone Title & Escrow, Inc. v. Evanston Ins. Co.,* —— Fed. App'x ——, 2014 WL 631098, at *4 (4th Cir. Feb. 19, 2014). Accordingly, " 'ordinary principles of contract interpretation apply.' " *Megonnell v. United Servs. Automobile Ass'n,* 368 Md. 633, 655, 796 A.2d 758, 772 (2002) (citation omitted); *see Dutta v.. State Farm Ins. Co.,* 363 Md. 540, 556, 769 A.2d 948, 957 (2001).

**\*7** "In order to determine the intention of the parties to an insurance contract, the instrument must be construed as a whole and 'the character of the contract, its purpose, and the facts and circumstances of the parties at the time of execution' must be examined."*United Services Auto. Ass'n v. Riley,* 393 Md. 55, 79, 899 A.2d 819, 833 (2006) (quoting *Chantel Assocs. v. Mt. Vernon Fire Ins. Co.,* 338 Md. 131, 142, 656 A.2d 779, 784 (1995)). However, the court bears responsibility for ascertaining the scope and limitations of an insurance policy. *See Fister v. Allstate Life Ins. Co.,* 366 Md. 201, 210, 783 A.2d 194, 199 (2001); *Lloyd E. Mitchell, Inc. v. Maryland Casualty Co., Inc.,* 324 Md. 44, 56, 595 A.2d 469, 475 (1991). In " 'deciding the issue of coverage under an insurance policy, the primary principle of construction is to apply the terms of the insurance contract itself.' " *Universal Underwriters Ins. Co. v. Lowe,* 135 Md.App. 122, 137, 761 A.2d 997, 1005 (2000) (quoting *Bausch & Lomb, Inc. v. Utica Mut. Ins. Co.,* 330 Md. 758, 779, 625 A.2d 1021 (1993)).

The Maryland Court of Appeals has explained that judicial "interpretation of insurance contracts to determine the

scope and limitations of the insurance coverage, like any other contract, begins with the language employed by the parties."*MAMSI Life & Health Ins. Co. v. Callaway,* 375 Md. 261, 279, 825 A.2d 995, 1005 (2003). Generally, Maryland courts "analyze the plain language of [an insurance] contract according to the words and phrases in their ordinary and accepted meanings as defined by what a reasonably prudent lay person would understand them to mean."*Universal Underwriters Ins. Co.,* 135 Md.App. at 137, 761 A.2d at 1005;*see Walk v. Hartford Cas. Ins. Co.,* 382 Md. 1, 14–15, 852 A.2d 98, 106 (2004); *Litz v. State Farm,* 346 Md. 217, 224, 695 A.2d 566, 569 (1997). However, if there is evidence that the parties intended to ascribe a special or technical meaning to certain words used in an insurance contract, those words are construed in accordance with that understanding. *Valliere v. Allstate Insurance Co.,* 324 Md. 139, 142, 596 A.2d 636, 638 (1991) ("When a policy defines a term in a manner which differs from the ordinary understanding of that term, the policy definition controls."); *see also Walk,* 382 Md. at 14–15, 852 A .2d at 106; *Dutta,* 363 Md. at 556, 769 A .2d at 957.

If the court deems the provisions of an insurance policy unambiguous, the meaning of the terms is determined by the court as a matter of law. *Cole,* 359 Md. at 305, 753 A.2d at 537; *Wells v. Chevy Chase Bank, F.S.B.,* 363 Md. 232, 250, 768 A.2d 620 (2001); *see Cornerstone Title & Escrow,* 2014 WL 631098, at * 4. In that circumstance, " 'a court has no alternative but to enforce those terms.' " *Megonnell,* 368 Md. at 655, 796 A .2d at 772 (quoting *Dutta,* 363 Md. at 557, 556 A.2d at 1138). But, if a contractual term is ambiguous, the court may consult "extrinsic sources" to ascertain the meaning. *Cole,* 359 Md. at 305, 753 A .2d at 537. A policy term is considered "ambiguous if, to a reasonably prudent person, the term is susceptible to more than one meaning." *Id.* at 306, 753 A.2d at 537. The treatise, G.J. Couch, 2 *Couch Cyclopedia of Insurance Law* (2d ed.1959), on which the Maryland appellate courts have relied, states: "The criterion is ambiguity from the standpoint of a layman, not from that of a lawyer." *Id.,* § 15:84, at 416–418.

**\*8** " 'Maryland does not follow the rule that insurance policies should, as a matter of course, be construed against the insurer.' " *Megonnell,* 368 Md. at 655, 796 A.2d at 771 (citation omitted); *see Bushey v. Nothern Assurance Co. of America,* 362 Md. 626, 632, 766 A.2d 598, 601 (2001); *Collier v. MDIndividual Practice Ass'n,* 327 Md. 1, 5, 607 A .2d 537, 539 (1992). But, "if ambiguity is determined to remain after consideration of extrinsic evidence, 'it will

Appeal: 14-1924    Doc: 19    Filed: 11/19/2014    Pg: 50 of 59

Navigators Specialty Ins. Co. v. Medical Benefits Adm'rs of..., Not Reported in...

2014 WL 768822

ordinarily be resolved against the party who drafted the contract,' where no material evidentiary factual dispute exists." *Clendenin Bros., Inc. v. U.S. Fire Ins. Co.,* 390 Md. 449, 459–60, 889 A.2d 387, 394 (2006); *see Callaway,* 375 Md. at 280, 825 A.2d 995, 1005–06 ("[W]hen a term in an insurance policy is found to be ambiguous, the court will construe that term against the drafter of the contract which is usually the insurer.").

A recent case in this district, *FINRA v. Axis,* 2013 W L 2946950, presented issues similar to those in the case at bar and provides guidance. The court in *FINRA v. Axis* interpreted an employment liability insurance policy issued to FINRA by Axis. The key question was whether an email sent to FINRA by counsel for a FINRA employee constituted a "claim" within the meaning of the policy. The policy defined "claim" as "the receipt by any Insured of ... a written demand against any Insured for monetary or non-monetary relief[.]"*Id.* at *1. The email in question, which referred to a prior, oral conversation, stated, *id.:*

> Not to quibble, but just so that we are clear, I did not ask for 5 years of "severance pay." I said that Mr. Reich believed that FINRA's decision to terminate his employment was discriminatory, in that his age was a motivating factor. I added that Mr. Reich would settle that claim for a sum equal to 5 years' pay. You said that you could get him 12 months, but no more than that and that if Mr. Reich chose not to accept that, his last day would be March 31. Mr. Reich rejects your counter-offer.

Judge Grimm held that the definition of "claim" was unambiguous and that the email constituted a claim as a matter of law. In particular, he stated, *id.* at *4 (quotation marks and citations omitted):

> A reasonably prudent person could not read the Policies and conclude that "claim" did not encompass written correspondence stating an amount for which an individual would settle a claim or, more specifically, that the February 3, 2011 email was anything other than a claim. To begin with, courts have found that the term 'claim' as used in liability insurance policies is unambiguous. Moreover, the Fourth Circuit stated that there was "no ambiguity" in an insurance policy that defined "claim" as "a written

demand for monetary or non-monetary relief."Therefore, the meaning of "claim" as it pertains to the February 3, 2011 email is unambiguous and is an issue of law for this Court to resolve.

**\*9** I also draw guidance from *SNL Fin., LC v. Philadelphia Indem. Ins. Co.,* 455 F. App'x 363, 368 (4th Ci r.2011), in which the Fourth Circuit interpreted an employment liability insurance policy. The policy defined "claim" as "a written demand for monetary or nonmonetary relief."*Id.* The court explained that there was "no ambiguity in this policy language" and proceeded to "apply the plain meaning of that language" in considering whether two letters sent by counsel for an employee of the insured constituted a "claim" under the policy. In the first letter, counsel for the employee "asked to meet with SNL representatives to discuss certain discriminatory conduct that occurred during the course of [the employee's] employment with [SNL], including [his] termination."*Id.* at 365 (internal quotation marks omitted). In a second letter, counsel for the employee wrote, *id.* at 365 n. 4:

> On January 18, 2008, we wrote in an effort to resolve certain issues that exist with respect to the above-referenced matter. In that letter, a copy of which is attached, we expressed our belief that a meeting with the appropriate person designated by you might prove helpful. To that end, we once again invite you to have your personal representative contact us so that we can pursue a possible amicable resolution of the issues, at this time.

The court concluded that the letters did not constitute "claims" under the policy. It explained, *id.* at 368:

> In these letters written on [the employee's] behalf, counsel: 1) refers to "certain discriminatory conduct" that purportedly occurred during [the employee's] employment with SNL; 2) states a "desire" to meet with SNL's representatives to "discuss" the issues, with a "hope" of arriving at an "amicable resolution"; and 3) requests that a SNL representative contact [counsel] to arrange such a meeting. These statements do not include a "demand" for any relief,

either monetary or non-monetary. Therefore, we conclude that neither letter ... contained a "claim," as that term is defined in the policy.

The 2010–2011 Policy defines "claim" as a "demand received by an **Insured** for money or services...." 2010–2011 Policy at 19 (defined term bolded in original). As in *FINRA v. Axis* and *Klein,* this language is unambiguous and its interpretation is a matter of law for the Court. Applying the lessons of *FINRA v. Axis* and *Klein,* I conclude that neither the June 2009 Email nor the June 2009 Letter constitutes a "claim" as that term is defined in the 2010–2011 Policy.

As for the June 2009 Email and the June 2009 Letter, neither communication included any demand for money or services. Both communications referred to an accounting discrepancy, and the letter described how Lloyd's arrived at its conclusion that the discrepancy existed and requested "details and supporting documentation" about any additional claims that may exist. June 2009 Letter, ECF 47–11 at 12. The letter also explained that NIIS had been unable to complete its audit because RJW had not provided it with certain information.*Id.* at 13 ("[W]e attempted a reconciliation of the aggregate advancements ... [but] during the second day of our on-site review we were informed ... that approximately half of the files could not be located."). However, neither communication demanded payment of a sum of money, threatened litigation, or otherwise signified that the discrepancy was anything more than an accounting matter. Accordingly, neither communication constitutes a "claim" under the 2010–2011 Policy.

 *10  In contrast, however, the January 2010 Letter undoubtedly constitutes a claim. The January 2010 Letter expressly accused RJW of errors and omissions and it made a demand for money. It stated: "As a result of errors and omissions by R.J. Wilson & Associates, a demand is hereby made for the $1,113,811.66 in Specific and Aggregate amounts paid.... Perhaps we can resolve this claim without the necessity of litigation which we are fully prepared to commence."A reasonably prudent person would conclude that the definition of "claim" in the 2010–2011 Policy included an explicit, written demand for a particular amount of money, accompanied by a threat of litigation.

Defendants do not contest that they received the January 2010 Letter and that it contained a demand for payment. Opp. at 11. However, they argue that the demand did not constitute

a "claim" because "RJW and MBA reasonably believed the January 29, 2010 letter to be in error."*Id.* Defendants list several reasons why they believed they did not owe the money demanded in the January 2010 Letter, *id.* at 11–13, and they maintain that when the demand was made, "Ronald Wilson had every indication that this was simply an accounting matter, which would be reconciled by the accountants in the final accounting."*Id.* at 13.Defendants then conclude, without citation, *id.*:"These facts, at the very least, raise a dispute of fact as to whether a 'Claim' was made against RJW and MBA prior to the 2010–2011 policy period."

Under defendants' rationale, even a lawsuit would not constitute a demand if the claims in the suit lacked merit. That position makes no sense. Indeed, defendants fail to support their conclusion. They do not identify, and I have not found, any language in the 2010–2011 Policy suggesting that the actual or perceived merits of a demand have any impact on whether that demand constitutes a "claim." The language of the policy simply states, without qualification, that a claim is "[a] demand received by an **Insured** for money or services...." The January 2010 Letter clearly included a demand for money; thus, it constituted a claim under the policy.

Defendants also attempt to avoid summary judgment by claiming that there are disputes of material fact as to the question of when a "claim" was first made against defendants. Again, however, the only dispute of fact defendants identify is whether the demand in the January 2010 Letter was meritorious. This dispute of fact is not "material" because, as explained, the actual or perceived merits of the demand are irrelevant to the determination of whether the demand constitutes a "claim" under the policy. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986) (noting that material facts are "facts that might affect the outcome of the suit").

For the foregoing reasons, I conclude that the January 2010 Letter constituted a "claim" made against the defendants, as that term was used in the 2010–2011 Policy. And, because it is undisputed that coverage is only available under the 2010–2011 Policy for a claim that was first made against the insured between October 31, 2010 and October 31, 2011, I conclude that no coverage is available under the 2010–2011 Policy. [13]

### *The 2009–2010 Policy*

Appeal: 14-1924    Doc: 19    Filed: 11/19/2014    Pg: 52 of 59

Navigators Specialty Ins. Co. v. Medical Benefits Adm'rs of..., Not Reported in...

2014 WL 768822

**\*11** The parties have also both moved for summary judgment on the question of whether the Maryland Action is covered under the 2009–2010 Policy, which provides coverage for claims made and reported between October 31, 2009 and October 31, 2010. *See* 2009–2010 Policy, ECF 47–19 at 2. In light of the foregoing discussion, it is clear that the "claim" was first made against defendants in January 2010, which is within the policy period of the 2009–2010 Policy. However, Navigators insists that no coverage is available under the 2009–2010 Policy, and it offers two separate reasons.

First, Navigators cites Section I.A.2 of the 2009–2010 Policy, which provides that coverage is only available if, "prior to the inception of this policy ... no insured had a basis to believe that any [ ] act or omission ... might reasonably be expected to be the basis of a claim."In other words, plaintiff maintains that the 2009–2010 Policy does not provide coverage for claims arising from acts occurring before the inception of the 2009–2010 Policy if there was a reasonable basis to believe that those acts would eventually form the basis of a claim within the coverage period. And, according to Navigators, even if the June 2009 communications did not constitute claims, the existence of the accounting dispute would have given "a reasonable person ... a basis to believe" that the dispute "might result in a Claim." Memo at 19.

Defendants disagree. In their view, "the determination as to whether RJW and MBA should have expected that this simple accounting issue might form the basis of a claim is an issue of fact which must be decided by the trier of fact."Opp. at 15.

I agree with defendants. The question of whether a reasonable person would have believed that a claim would result from the accounting discrepancy "is a matter about which reasonable minds could differ, and it [is] therefore inappropriate for resolution by summary judgment."*Baysinger v. Schmid Products Co.,* 307 Md. 361, 367–68, 514 A.2d 1, 4 (1986). Accordingly, I will not grant summary judgment to Navigators on this ground.

Navigators next argues that, even if the claim was *made* within the policy period of the 2009–2010 Policy, it is undisputed that defendants did not *report* the claim to Navigators within the policy period of the 2009–2010 Policy. Instead, defendants reported the claim to Navigators on or about July 25, 2011. *See* Ex. O to Park Dec (ECF 47–18) at 3. According to Navigators, defendants' failure to report the

claim within the coverage period absolves Navigators of any coverage responsibility under the 2009–2010 Policy.

Defendants counter that, under Maryland l aw, an insurer must show prejudice before denying coverage on the ground that an insured failed to provide timely notice of a claim. A nd, they argue that Navigators has failed to show that it was prejudiced by the failure to receive notice within the policy period. Alternatively, defendants contend that the question of prejudice is one for the trier of fact. Navigators responds that, under the circumstances attendant here, Maryland law does not require an insurer to show prejudice and, in any event, Navigators was prejudiced from defendants' failure to report the claim.

**\*12** The parties' dispute about whether a showing of prejudice is necessary turns on whether Md.Code (2011 Repl.Vol., 2013 Supp.) § 19–110 of the Insurance Article ("Ins.") applies to claims-made-and-reported policies such as the one in this case. Ins. § 19–110 provides:

> An insurer may disclaim coverage on a liability insurance policy on the ground that the insured ... has breached the policy by failing to cooperate with the insurer or by not giving the insurer required notice only if the insurer establishes by a preponderance of the evidence that the lack of cooperation or notice has resulted in actual prejudice to the insurer.

In support of their positions, both sides point to the Maryland case of *Sherwood Brands, Inc. v. Great Am. Ins. Co.,* 418 Md. 300, 303, 13 A.3d 1268, 1270 (2011), although they offer contrasting interpretations. Defendants maintain that *Sherwood* squarely held that § 19–110 applies to claims-made-and-reported policies. Plaintiff disagrees, arguing that *Sherwood* held only that § 19–110 applies to claims-made policies, but did not hold that § 19–110 also applies to claims-made-and-reported policies. And, according to plaintiff, prior Maryland cases made clear that § 19–110 does not apply to claims-made-and-reported policies.

Since *Sherwood,* three judges in this district have addressed the applicability of § 19–110 to claims-made-and-reported policies, but they have reached differing conclusions. Judge Bredar and Judge Grimm have both ruled that § 19–110 was inapplicable to the claims-made-andreported policies in

Appeal: 14-1924    Doc: 19    Filed: 11/19/2014    Pg: 53 of 59

Navigators Specialty Ins. Co. v. Medical Benefits Adm'rs of..., Not Reported in...

2014 WL 768822

their respective cases. *See FINRA v. Axis, supra,* 2013 W L 2946950 (Grimm, J.); *Minnesota Lawyers Mut. Ins. Co. v. Baylor & Jackson, PLLC,* 852 F.Supp.2d 647 (D.Md.2012) (Bredar, J.), *aff'd,* 531 F. App'x 312 (4th Cir.2013). [14] More recently, however, Judge Bennett determined that § 19–110 did apply to a claims-made-and-received policy. *See McDowell Bldg., LLC v. Zurich Am. Ins. Co.,* 2013 WL 5234250 (D.Md. Sept. 17, 2013).

Upon review of *Sherwood* and the cases that have followed in its wake, I agree with Judge Bennett that § 19–110 applies to claims-made-and-reported policies. Maryland law requires insurers to show prejudice in order to disclaim coverage for untimely notice.

In *Sherwood,* Great American Insurance Company ("Great American") issued a liability insurance policy to Sherwood Brands, Inc. ("Sherwood"). Section III of the policy defined "claim" as either "(1) a written demand for monetary or non-monetary relief" or "(2) a civil, criminal, administrative or arbitration proceeding made against any Insured seeking monetary or non-monetary relief."*Sherwood,* 418 Md. at 304–05, 13 A.3d at 1271. Section VIII of the policy, "Notice of Claim," provided, in pertinent part, *id.* at 305, 13 A .3d at 1271:

A. The Insureds shall, as a condition precedent to their rights under this Policy, give the Insurer notice in writing of any Claim....

**\*13** (1) as defined in Section III.A.(1) which is made during the Policy Period. Such notice shall be given prior to the end of the Policy Period;

(2) as defined in Section II I.A.(2) [*supra* ] which is made during the Policy Period. Such notice shall be given as soon as practicable, but in no event later than ninety (90) days after the end of the Policy Period.

Sherwood was sued within the policy period. However, it did not give notice to Great American until more than 90 days after the end of the policy period.*Id.* at 305–06, 13 A.3d at 1271–72. The trial court granted Great American's cross-motion for summary judgment, holding that it was not required by § 19–110 to show actual prejudice. The Maryland Court of Appeals reversed.

The *Sherwood* Court began its analysis by tracing the origins of Ins. § 19–110, which arose from legislative dissatisfaction with the Maryland Court of Appeals's decision in *Watson*

*v. United States Fidelity and Guaranty Co.,* 231 Md. 266, 189 A.2d 625 (1963), *superseded by statute,* Ins. § 19–110. In *Watson,* the Maryland Court of Appeals held that an insurer was not required to show prejudice in order to deny coverage to an insured who failed to timely notify the insurer. *See Watson,* 231 Md. at 273, 189 A .2d at 628; *Prince George's County v. Local Gov't Ins. Trust,* 388 Md. 162, 181, 879 A.2d 81, 93 (2005) (discussing *Watson* ). At the legislative session immediately following *Watson,* the General Assembly enacted what is now Ins. § 19–110. The *Sherwood* Court noted three potential reasons for the General Assembly's swift reaction, *id.* at 312, 13 A.3d 1275 (quoting *A Legal Process Analysis for a Statutory and Contractual Construction of Notice and Proof of Loss Insurance Disclaimers,* 38 Md. L.Rev. 299, 309–10 (1978)):

> First, an aura of unfairness emanates from a situation in which an insurance company is permitted to disclaim liability when it is not prejudiced by the insured's breach of a condition precedent. In such a situation, the insurer receives an unjustifiable windfall. Second, the *Watson* rule allows an unreasonable forfeiture by permitting the insurer's assertion of a technical irregularity to deny protection for which the insured has paid. Finally, allowing an insurer to disclaim liability has the undesirable effect of leaving victims of automobile accidents uncompensated by their paid-for insurance coverage.

The *Sherwood* Court then outlined the development of the case law interpreting and applying Ins. § 19–110. Of particular note was *T.H.E. Ins. Co. v. P.T.P. Inc.,* 331 Md. 406, 422, 628 A.2d 223, 231 (1993), [15] in which an insurer denied coverage under a claims-made policy because the claim had not been asserted against the insured within the policy period. The *T.H.E.* Court held that Ins. § 19–110 did not apply in such a case. The court first noted that, by its terms, the version of Ins. § 19–110 then in effect applied only when the insurer sought to "disclaim coverage on any policy of liability insurance ... on the ground that the insured ...*has breached the policy*... by not giving requisite notice to the insurer."*Id.* at 416–417 (emphasis added). [16] The *T.H.E.* Court then reasoned that "there can be no breach of the policy where a claim is 'made' after the policy's

Appeal: 14-1924    Doc: 19    Filed: 11/19/2014    Pg: 54 of 59

Navigators Specialty Ins. Co. v. Medical Benefits Adm'rs of..., Not Reported in...

2014 WL 768822

expiration ... as one cannot 'breach' a policy that is no longer in existence."*Sherwood,* 418 Md. at 319, 13 A.3d at 1279.

**\*14** In *Sherwood,* the Maryland Court of Appeals "carefully circumscrib [ed] its holding in *T.H.E.*"*McDowell,* 2013 WL 5234250, at \*7. Interpreting its own case (*T.H.E.*), the *Sherwood* Court stated that *"T.H.E.* does *not* stand for the proposition that the statute does not apply to a 'claims made plus reporting' policy," and it expressly disapproved of conclusions to the contrary reached by the Fourth Circuit and two Maryland federal district courts. [17] *Sherwood,* 418 Md. at 327 n. 22, 13 A.2d at 1284 n. 22 (emphasis in original, internal quotation marks omitted); *see id.* at 326 n. 21,13 A.2d at 1284 n. 21 ("[W]e disavow ourselves of language in *Janjer, Maynard,* and *Rouse* suggesting that *T.H.E.* be read to stand for the proposition that § 19–110 does not apply to all 'claims-made-and-reporting policies.' "). The *Sherwood* Court explained, *id.* at 326–27,13 A.2d at 1284 (internal citations omitted):

> *T.H.E.* is not dispositive of the issue before us. The Court in *T.H.E.* was careful to circumscribe its holding by stating that "[i]t would be an incorrect oversimplification to express the issue here to be whether [§ 19–110] applies at all to claims made policies."One reading of *T.H.E.,* then, is that it ... said nothing about a situation in which claims are made against the insured before the expiration date of the policy (as in the present case).

Turning to the policy before it, the *Sherwood* Court reiterated that Ins. § 19–110 only applies when the insured breaches the insurance policy. The court then drew a distinction between a condition precedent and a covenant, noting that if the notice provision in the policy was a condition precedent to coverage, "then Sherwood does not 'breach the policy' by failing to obey the notice provisions" because the policy was never triggered. *Sherwood,* 418 Md. at 330, 13 A.3d at 1286 (citing Restatement (Second) of Contracts § 225 (1981)). However, "if the notice provisions are deemed covenants, Sherwood's failure to give Great American notice ... would constitute a 'breach of the policy,' such that § 19–110 would apply to require Great American to show that it was prejudiced by Sherwood's late-delivered notice."*Sherwood,* 418 Md. at 330, 13 A.3d at 1286.

The *Sherwood* Court concluded that the notice provisions were covenants. Critically, the court's holding was based not on the particular language of the policy before it, but rather on its conclusion that " § 19–110 mandates that the

notice provisions of the Policy be treated as covenants, not conditions."*Id.* at 331, 13 A .3d at 1286. Indeed, the insurance policy at issue in *Sherwood* expressly classified the notice provision as a condition precedent, but the court refused to treat it as such. According to the court, the very purpose of Ins. § 19–110 was to overrule *Watson'* s "strict condition-precedent approach," and therefore to make "policy provisions requiring notice to, and cooperation with, the insurer *covenants and not conditions."Id.* (emphasis in original; internal quotations omitted). The court held, *id.* at 333, 13 A.3d at 1288:

> **\*15** [W]e hold that § 19–110 does apply, as is the case at present, to claims-made policies in which the act triggering coverage occurs during the policy period, but the insured does not comply strictly with the policy's notice provisions. In the latter situation, § 19–110 mandates that notice provisions be treated as covenants, such that failure to abide by them constitutes a breach of the policy sufficient for the statute to require the disclaiming insurer to prove prejudice.

*See also id.* at 326 n. 21, 13 A.3d 1284 n. 21 ("Notice provisions, even in claims-made-andreporting policies, must be deemed covenants such that failure to abide by them constitutes a breach of the policy sufficient to make § 19–110 applicable to such policies.").

In my view, *Sherwood's* conclusion is crystal clear: Ins. § 19–110 applies to claimsmade-and-reported policies, like the one at issue here, when the claim is made within the policy period but is not reported until after the policy period. In such a case, the insurer must show actual prejudice in order to avoid coverage.

Plaintiff's arguments to the contrary are unpersuasive. Plaintiff suggests that the policy at issue in *Sherwood* was a claims-made policy rather than a claims-made-and-reported policy, *see* Navigators Reply at 14, and cites several Fourth Circuit and Maryland district court cases for the proposition that Ins. § 19–110 does not apply to claims-made-and-reported policies. *See* Navigators Reply at 13 (citing, *e.g., Janjer,* 97 F. App'x 410; *Maynard,* 55 F. App'x 667; *Rouse,* 991 F.Supp. 460). However, as noted, in *Sherwood* the Maryland high court, performing its duty to interpret Maryland l aw, expressly "disavow [ed] language in *Janjer,*

Appeal: 14-1924    Doc: 19    Filed: 11/19/2014    Pg: 55 of 59

Navigators Specialty Ins. Co. v. Medical Benefits Adm'rs of..., Not Reported in...

2014 WL 768822

*Maynard,* and *Rouse* suggesting that *T.H.E.* be read to stand for the proposition that § 19–110 does not apply to all 'claims-made-and-reporting policies.' " *Sherwood,* 418 Md. at 326 n. 21, 13 A .3d at 1284 n. 21.

Moreover, the policy in *Sherwood* had elements of both types of policies. It required an insured to give notice that it had been sued "as soon as practicable, but in no event later than ninety (90) days after the end of the Policy Period."*Id.* at 326, 13 A.3d at 1284. And, the *Sherwood* Court did not expressly categorize the policy, instead noting that it had elements of both a claims-made policy and a claims-made-and-reported policy. *See id.* ("It would be simple-if not lazy-for us to conclude that *T .H.E.* held that § 19–110 does not apply to claimsmade policies, pronounce the Policy a claims-made policy, and move on to the next case. We decline to follow that path.... Further, it would be simple to focus on the portion of the Policy requiring Sherwood to give notice 'as soon as practicable, but in no event later than ninety (90) days after the end of the Policy Period,' declare the Policy a 'claims-made-and-reported' policy, and jump on the bandwagon of other jurisdictions that decline uniformly to extend noticeprejudice rules to claims-made-and-reported policies. But no, we shall take the path less traveled.").

**\*16** In any event, even if the 2009–2010 Policy at issue here were a claimsmade policy, the *Sherwood* Court made clear that its holding applied regardless of the precise nature of the policy. The court expressly ruled: "Notice provisions, *even in claims-made-and-reporting policies,* must be deemed covenants such that failure to abide by them constitutes a breach of the policy sufficient to make § 19–110 applicable to such policies."*Sherwood,* 418 Md. at 327 n. 21, 13 A.3d at 1284 n. 21 (emphasis added). [18]

Navigators also argues that defendants previously "represented to the Court that the current Maryland law is that prejudice is not required" on claims-made-and-reported policies, and therefore should not be permitted to take a different position in the context of the pending motions. In particular, plaintiff points to defendants' "Motion to Stay Proceedings" pending a decision by the Fourth Circuit in the *Minnesota Lawyers* case. ECF 30. In defendants' memorandum in support of that motion (ECF 30–1), they explained that "the Fourth Circuit's decision will be dispositive of the prejudice issue in this case." [19] According to plaintiff, the Fourth Circuit's affirmance of the district court's decision requires plaintiff to abide by the district court's decision that no showing of prejudice is required. However,

as discussed, *supra,* the Fourth Circuit in *Minnesota Lawyers* expressly declined to take any position as to whether a showing of prejudice was required. *See Minnesota Lawyers,* 531 F. App'x at 320. Defendants' expectation that the Fourth Circuit would address a crucial issue pertinent to this case does not bind defendants to a position the Fourth Circuit declined to take.

For the foregoing reasons, I conclude that Ins. § 19–110 applies to this case and requires Navigators to prove, by a preponderance of the evidence, that it suffered actual prejudice resulting from defendants' failure to notify it of the claim within the policy period.

Navigators argues that it has, in fact, suffered prejudice. In particular, Navigators contends that, if it had been timely notified, it could have helped avoid litigation by appointing "an accounting expert to reconcile the aggregate accommodation advances" or by assisting in settling the matter. Navigators Reply at 18. Further, Navigators argues that had it known of the dispute when it issued the 2010–2011 Policy, it "could have increased the premium" that it charged defendants "or decided to not renew" the policy. *Id.* In response, defendants argue that Navigators is unable to meet its burden because it "proffers only speculation and conjecture as to what it 'could have' done differently."Def. Reply at 11. In defendants' view, Navigators "points to no lost witnesses or missing documents,""offers no evidence of foregone settlement opportunities," and "offers no facts to show that hiring an accountant would have avoided litigation."*Id.*

**\*17** As indicated, under Maryland l aw, the insurer bears the burden of proof to show prejudice, and must do so by a preponderance of the evidence. *See Prince George's Cnty. v. Local Gov't Ins. Trust,* 388 Md. 162, 879 A.2d 81, 97 (2005)."The requirement of 'actual prejudice' means that an insurer may not disclaim coverage on the basis of prejudice that is only possible, theoretical, conjectural, or hypothetical."*Gen. Acc. Ins. Co. v. Scott,* 107 Md.App. 603, 615, 669 A.2d 773, 779,*cert. denied,*342 Md. 115, 673 A.2d 707 (1996); *see Elste v. ISG Sparrows Point, LLC,* 188 Md.App. 634, 651, 982 A.2d 938, 948 (2009); *Commercial Union Ins. v. Porter Hayden Co.,* 116 Md.App. 605, 698 A.2d 1167, 1197 (1997); *see also Oliff–Michael v. Mutual Benefit Ins. Co.,* 262 F.Supp.2d 602, 604 (D.Md.2003). Moreover, it is not enough for an insurer to "surmise harm that may have occurred by virtue of the passage of time; prejudice cannot be presumed from the length of the delay."*Scott,* 107 Md.App.

Appeal: 14-1924    Doc: 19    Filed: 11/19/2014    Pg: 56 of 59

Navigators Specialty Ins. Co. v. Medical Benefits Adm'rs of..., Not Reported in...

2014 WL 768822

At 615, 669 A.2d at 779;*accord Prince George's Cnty.,* 388 Md. at 190 n. 13, 879 A.2d at 98 n. 13.

Navigators has not pointed to any facts in the record to support its assertion that it was prejudiced by defendants' failure to provide timely notice. Although Navigators claims that it could have appointed an accounting expert to attempt to resolve the dispute prior to litigation, it offers no evidence that this accounting expert would have been able to reconcile the discrepancies in the records of defendants and Lloyd's. Similarly, although Navigators claims that it could have engaged in settlement negotiations with Lloyd's, it provides no evidence to suggest that those settlement negotiations would have been fruitful. Indeed, Navigators has been defending RJW and MBA in the Maryland Action for more than two years and has seemingly been unable (or unwilling) to negotiate a settlement. Navigators provides no evidence to explain why earlier notice would have allowed it to negotiate a settlement that has now eluded it for over two years.

Navigators' final suggestion-that it could have increased defendants' premiums had it known of the claim prior to issuing the 2010–2011 policy-is doubly flawed. First, the prejudice inquiry relates to whether the insurer was prejudiced in "investigating, settling, or defending" the untimely claim.*Sherwood Brands, Inc. v. Great Am. Ins. Co.,* 418 Md. at 331, 13 A.3d at 1287. It is not so broad as to encompass prejudice it may have suffered in relation to other policies or other aspects of its business. In any event, Navigators offers no affidavits, testimony, or other evidence to support its assertion that it *could* have increased defendants' premiums, and even more to the point, Navigators offers no evidence that it *would* have done so. In short, Navigators' purported prejudice is wholly speculative and is entirely unsupported by the record.

In sum, I conclude that Navigators is required to show actual prejudice before denying coverage under the 2009–2010 Policy. And, at this juncture, Navigators has not proffered any evidence of prejudice. I also conclude that there remains a fact question over whether the dispute that gave rise to the Maryland Action "might reasonably [have been] expected to be the basis of a claim," such that Navigators would be permitted to deny coverage pursuant to Section I.A.2 of the 2009–2010 Policy. Accordingly, with respect to the 2009–2010 Policy, the crossmotions for summary judgment will be denied.

### *Duty to Indemnify*

**\*18**  Navigators also argues that it has no duty to indemnify defendants under either policy because "RJW is only covered ... to the extent it is held *vicariously liable* for MBA's acts or omissions," but "the wrongful acts complained of were committed by and/or were the responsibility of RJW." Memo at 19 (emphasis added). According to Navigators, "[t]he Maryland Action concerns the failure of the Defendants to properly account for the monthly bordereaux for the aggregate accommodation advances [and] RJW is responsible for preparing and reviewing the monthly bordereaux before they are sent to the Lloyd's broker."Memo at 19. Therefore, the argument goes, any liability in the Maryland Action would arise only out of the acts and omissions of RJW, for which there is no coverage under either policy. [20]

Defendants argue that coverage for RJW is *not* limited to its vicarious liability for MBA's acts, but rather is available for RJW's own acts and omissions. However, their argument contradicts the plain language of the Additional Insured Endorsement.

As discussed, judicial "interpretation of insurance contracts to determine the scope and limitations of the insurance coverage, like any other contract, begins with the language employed by the parties ."*MAMSI Life & Health Ins. Co., supra,* 375 Md. at 279, 825 A.2d at 1005. Generally, Maryland courts "analyze the plain language of [an insurance] contract according to the words and phrases in their ordinary and accepted meanings as defined by what a reasonably prudent lay person would understand them to mean."*Universal Underwriters Ins. Co., supra,* 135 Md.App. at 137, 761 A.2d at 1005.

MBA is the named insured under the 2009–2010 Policy. RJW is not named in the 2009–2010 Policy. RJW is, however, named in Endorsement # 2 to the 2009–2010 Policy, titled "Additional Insured Endorsement." It provides that RJW "shall be added as additional Insureds under this policy, but only as respects [its] liability for an Insured's acts or omissions."Defendants' argument is that the first clause in the quoted sentence makes RJW an "Insured," and then the second clause guarantees coverage for the acts or omissions of an "Insured," which-because of the first clause-includes RJW.

Appeal: 14-1924    Doc: 19    Filed: 11/19/2014    Pg: 57 of 59

Navigators Specialty Ins. Co. v. Medical Benefits Adm'rs of..., Not Reported in...

2014 WL 768822

RJW's argument slices the bread far too thin. The first clause provides that RJW is an additional insured, but the second clause qualifies the first, making clear that RJW is covered *only* to the extent that it is held liable for the acts or omissions of an insured. The use of the conjunction "but only" makes this limitation crystal clear. If the Endorsement were intended to provide coverage for RJW's own acts or omissions, it would have omitted the qualification and simply named RJW as an additional insured. Accordingly, I conclude that RJW is insured under the 2009–2010 Policy only to the extent that it is held vicariously liable for the acts or omissions of MBA. Put differently, RJW is not insured under the 2009–2010 Policy for liability that arises from its own independent acts or omissions.

**\*19** However, summary judgment for Navigators would be premature because it is possible that liability will attach either to MBA or to MBA and RJW for MBA's acts or omissions. The Maryland Action is ongoing, and so the basis of any finding of liability has yet to be determined. Moreover, the complaint in the Maryland Action clearly alleges wrongful acts and/or omissions by MBA in relation to the discrepancies in the monthly bordereaux. For example, it expressly alleges that "it was MBA's obligation to review claims submitted by the insureds to confirm that payment was issued only on properly covered claims."ECF 1–1 ¶ 20. Further, the complaint in the Maryland Action alleges that MBA breached several duties by failing to maintain and produce accurate records. *Id.* ¶¶ 36, 37, 54, 55.And, the complaint alleges that Erin Burnett, "acting in her capacity as an officer of MBA and/or [RJW] ... was the individual who provided the bordereaux to [Lloyd's] on a monthly basis."*Id.* ¶ 29.

Navigators essentially asks this Court to rule that no liability in the Maryland Action will arise out of the acts and/or omissions of MBA, but that question must be decided in the first instance by the court in the Maryland Action. *Nautilus Ins. Co. v. BSA Ltd. P'ship,* 602 F.Supp.2d 641, 657

(D.Md.2009) ("Generally, the question of whether a company must indemnify turns on a comparison of the *ultimate findings of fact* concerning the alleged occurrence with the policy coverage."(emphasis added) (internal quotation marks omitted)). Thus, it would be premature for this Court to declare that no coverage will be available. *Trice, Geary & Myers, LLC v. Camico Mut. Ins. Co.,* 459 F. App'x 266, 277 (4th Cir.2011) ("[A] declaration as to CAMICO Insurance's duty of indemnification would be premature at this time; such a declaration should instead be made after the underlying actions are resolved."); *Brohawn v. Transamerica Ins. Co.,* 276 Md. 396, 406, 347 A.2d 842, 849 (1975) ("[W]here, as here, the question to be resolved in the declaratory judgment action will be decided in pending actions, it is inappropriate to grant a declaratory judgment .").

## CONCLUSION

For the foregoing reasons, coverage is not available under the 2010–2011 Policy. Accordingly, I will grant plaintiff's motion for summary judgment as it relates to the 2010–2011 Policy and will deny defendants' cross-motion for summary judgment as it relates to that policy. With regard to the 2009–2010 Policy, a factual dispute remains with regard to whether the existence of the accounting dispute would have given a reasonable person a basis to believe that the dispute might result in a claim, thereby permitting Navigators to deny coverage pursuant to Section I.A.2 of the policy. Moreover, Navigators may not deny coverage on the basis of receiving untimely notice unless it proves prejudice by a preponderance of the evidence. Accordingly, I will deny both motions for summary judgment with regard to the 2009–2010 Policy.

**\*20** A separate Order follows, consistent with this Memorandum.

---

Footnotes

1    This Court has diversity jurisdiction, as plaintiff is a New York corporation with its principal place of business in New York, defendants are Maryland corporations with their principal places of business in Maryland, and the amount in controversy exceeds $75,000. *See*28 U.S.C. § 1332(a).

2    Although the Complaint states that Navigators seeks a "declaration that it has no obligation to continue defending MBA and RJW," Compl. ¶ 2, Navigators has since abandoned its argument regarding its duty to defend MBA and RJW. *See* Navigators Reply at 21 ("Navigators did not argue that there is no duty to defend.... Indeed, ... Navigators is currently providing a defense to both [defendants] in the Maryland Action."); *see also* Def. Reply at 14 ("Navigators concedes that the allegations of the Maryland Action trigger a duty to defend RJW and MBA.").

Appeal: 14-1924    Doc: 19    Filed: 11/19/2014    Pg: 58 of 59

Navigators Specialty Ins. Co. v. Medical Benefits Adm'rs of..., Not Reported in...

2014 WL 768822

3    In addition, Navigators filed a consolidated response in opposition to defendants' cross motion for summary judgment and a reply in support of its own motion for summary judgment ("Navigators Reply," ECF 51). Defendants also filed a reply ("Def. Reply," ECF 53).

4    A claimsmade-andreported policy requires, as a prerequisite to coverage, that a claim be made against the insured *and* reported to the insurer within the effective dates of the policy. *Rouse Co. v. Fed. Ins. Co.,* 991 F.Supp. 460, 465 (D.Md.1998). By contrast, a "claims-made" policy requires only that a claim be made against the insured during the policy period, and then reported "promptly" or "as soon as is practicable." *Id.; see Sherwood Brands, Inc. v. Great Am. Ins. Co.,* 418 Md. 300, 323, 13 A.3d 1268, 1282 (2011). A third type of policy, known as an "occurrence" policy, covers liability-inducing events "occurring during the policy term, irrespective of when an actual claim is presented."*St. Paul Fire & Marine Ins. Co. v. House,* 315 Md. 328, 332, 554 A .2d 404, 406 (1989).

    In at least one place in their Opposition, defendants refer to the policies as "claims-made" policies rather than as "claims-made-and-reported" policies.*See, e.g.,* Opp. at 4. However, the content of the Defendants' Opposition and Defendants' Reply make clear that defendants agree with plaintiffs that the policies are of the claimsmadeandreported variety.

5    Most of Navigators' exhibits in support of its Motion are attached to the Declaration of Jung H. Park, counsel for plaintiff ("Park Dec.," ECF 47–3). Defendants have objected to portions of the Park Declaration because "it is not based on personal knowledge and should be stricken from the record."Opp. at 5. Navigators appears to concede that portions of the Park Declaration are not based on Ms. Park's personal knowledge. Navigators Reply at 24–25. Accordingly, I will not rely on the paragraphs of the Declaration to which defendants object. However, defendants have not objected to the exhibits attached to the Park Declaration.

6    In the record, Brit Insurance is also referred to as "Brit Global Markets."

7    According to defendants, the product provides protection against unpredictable losses, and is purchased by employers who do not want to assume 100% of the risk of loss in regard to self-funded employee benefit plans. The insurer is liable for losses that exceed certain deductibles. ECF 48–1 at 2 n. 2.

8    A copy of the email itself is not in the record. However, the record contains a letter written by Ronald Wilson in response to the email, which quotes the language of the email. Moreover, the parties do not dispute that the letter accurately portrays the content of the June 2009 email from Ives to Ronald Wilson.

9    The letter is actually dated "January 29, 2009," but the parties agree that it was misdated. *See* Opp. at 10 n. 10.

10    Mr. Richards is "Director of Grosvenor Accident & Health."ECF 47–16.

11    Navigators also contends that a claim was made in 2008 when Brit "advised Ronald Wilson to notify his errors and omissions and fidelity carriers of the accounting dispute concerning the aggregate accommodations."Memo at 10. In support of its contention that Brit so advised Ronald Wilson, Navigators only proffers a letter sent in June 2011 from counsel for Lloyd's to counsel for defendants, which requests "[c]onfirmation that Wilson placed his errors and omissions and fidelity carriers on notice of this dispute, *as Brit requested in 2008."*June 2011 Letter, Ex. G to Park Dec (ECF 47–10) (emphasis added). As an initial matter, defendants deny that any such request was made in 2008, making it a disputed fact. *See* Wilson Dec. ¶ 20. In any event, Navigators does not provide any further detail about the nature of the 2008 "request," let alone a copy of the request itself. Accordingly, the Court cannot determine whether it satisfied the definition of a "claim."

    In addition, Navigators claims that Ronald Wilson admitted at his deposition that Lloyd's requested in 2008 that he place his insurer on notice of the dispute.*See* Navigators Reply at 20; ECF 47–8 at 181–84. However, the testimony Navigators cites, viewed in the light most favorable to defendants, *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986), does not contain such an admission. *See* Wilson Dec. ¶ 21.

12    In exercising diversity jurisdiction, a federal court "must apply the substantive law of the forum state including its choice of law rules."*Colgan Air, Inc. v. Raytheon Aircraft Co.,* 507 F.3d 270, 275 (4th Cir.2007) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496–97 (1941), and *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 79 (1938)). Maryland is the forum state. When an insurance policy contains no choice of law provision, Maryland applies the doctrine of *lex loci contractus,* under which " 'the law of the jurisdiction where the contract was made controls its validity and construction.' " *U.S. Life Ins. Co. v. Wilson,* 198 Md.App. 452, 463, 18 A.3d 110, 116 (2011). Moreover, the " '*locus contractu* of an insurance policy is the state in which the policy is delivered and the premiums are paid.' " *Id.* (citation omitted). In this case, that state is apparently Maryland; MBA's principal place of business office, to which the policies were addressed, is located in Maryland. *See* 2010–2011 Policy; *see also Volt Info. Sci., Inc. v. Bd. of Trustees of Leland Stanford Univ.,* 489 U.S. 468, 474 (1989) ( "interpretation of private contracts is ordinarily a question of state law"); *accord James v. Circuit City Stores, Inc.,* 370 F.3d 417, 421–22 (4th Cir.2004); *see also French v. Assurance Co. of Am.,* 448 F.3d 693, 700 (4th Cir.2006) (stating, in diversity declaratory action regarding coverage under insurance policy issued in Maryland, "we apply ... Maryland's substantive law regarding the interpretation of an insurance policy"). Moreover, all parties have relied upon Maryland case law in their briefing. I will do the same.

13    To be sure, the actual lawsuit would also constitute a "claim" under the policy, and the lawsuit was filed within the 2010–2011 policy period. However, the 2010–2011 Policy provides that "related claims" will be considered a single claim first made "during the policy

Appeal: 14-1924     Doc: 19     Filed: 11/19/2014     Pg: 59 of 59

Navigators Specialty Ins. Co. v. Medical Benefits Adm'rs of..., Not Reported in...

2014 WL 768822

period in which the earliest of the related claims" was first made. 2010–2011 Policy, Endt 4. And, it is undisputed that the Maryland Action is related to the earlier demand made in the January 2010 Letter. Thus, the operative date is the date of the January 2010 Letter. Additionally, Md.Code (2011 Repl.Vol., 2013 Supp.) § 19–110 of the Insurance Article ("Ins."), which, as discussed *infra*, requires an insurer to show actual prejudice before disclaiming coverage on the grounds that the claim was untimely *reported to the insurer*, does not require an insurer to show prejudice before disclaiming coverage on the grounds that the claim was *made against the insured* prior to the inception of the policy. In other words, the actual prejudice requirement of Ins. § 19–110 applies only to the notice provisions of a policy.

14      In affirming Judge Bredar's opinion, the Fourth Circuit did not reach the question of whether Ins. § 19–110 applies to claims-made-and-reported policies. Rather, it held that the insurer had shown prejudice and "affirm[ed] the district court's judgment on that basis, without determining the applicability of section 19–110 to [the] policy."*Minnesota Lawyers Mut. Ins. Co. v. Baylor & Jackson, PLLC,* 531 F. App'x 312, 320 (4th Cir.2013). Judge Thacker filed a dissenting opinion in which she stated, *id.* at 323:"Contrary to the district court's reasoning, however, *Sherwood Brands* makes clear that [§ 19–110] applies in this case to require [the insurer to] establish actual prejudice before it can properly disclaim coverage."

15      The facts of *T.H.E.* are set forth at length in *Sherwood* and in Judge Bennett's opinion in *McDowell.*Accordingly, I will not repeat them here.

16      The provision has been recodified and rephrased since *T.H.E.,* but the revisor's note to the 1996 codification states: "This section is new language derived without substantive change from former Art. 48A, § 482."*Sherwood,* 418 Md. at 322, 13 A.3d at 1282.

17      The Maryland Court of Appeals disapproved of the following cases: *Janjer Enters., Inc. v. Executive Risk Indem., Inc.,* 97 F. App'x 410 (4th Cir.2004); *Maynard v. Westport Ins. Corp.,* 208 F.Supp.2d 568 (D.Md.2002), *aff'd,*55 F. App'x 667 (4th Cir.2003); and *Rouse Co. v. Fed. Ins. Co.,* 991 F.Supp. 460 (D.Md.1998).

18      Plaintiff also relies on the portion of *FINRA v. Axis* that interpreted *Sherwood* as holding that § 19–110 does not apply to claims-made-and-reported policies. Upon review of that portion of the *FINRA v. Axis* opinion, I believe that the court's interpretation of *Sherwood* was erroneous, as it relied on a portion of the *Sherwood* opinion that merely set forth the law as it had been applied *up to that point* by the Fourth Circuit and other courts across the country. Later in the opinion, the *Sherwood* Court expressly stated that it disagreed with the authorities it had described in the earlier passage. *See Sherwood,* 418 Md. at 326 n. 21, 13 A.3d at 1284 n. 21;*see also id.* at 333–34, 13 A.3d at 1288 ("Ultimately, we are guided only-to the exclusion of other states' notice-prejudice jurisprudence-by the text of, and the policies underlying, § 19–110.").

19      The Fourth Circuit issued its opinion in *Minnesota Lawyers* before I ruled on the motion for stay. Accordingly, the motion was denied as moot. ECF 52.

20      This discussion relates only to Navigators' duty to *indemnify* RJW and MBA for liability resulting from the Maryland Action. It does not address Navigators' duty to *defend* RJW and MBA in the Maryland Action, which the parties agree "is broader than the duty to indemnify."*Perdue Farms, Inc. v. Travelers Cas. And Sur. Co. Of Am.,* 448 F.3d 252, 257 (4th Ci r.2006); *see Sheets v. Brethren Mut. Ins. Co.,* 342 Md. 634, 643, 679 A.2d 540, 559–60 (1996) (noting that the duty to defend arises as long as the plaintiff in a tort case alleges an "action that is potentially covered by the policy, no matter how attenuated, frivolous, or illogical that allegation may be."). As noted, *supra,* Navigators failed to provide substantive argument regarding the existence *vel non* of a duty to defend, and it continues to defend MBA and RJW in the Maryland Action.

---

**End of Document**                                                                 © 2014 Thomson Reuters. No claim to original U.S. Government Works.